[PUBLISH]

\

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-15492

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 17, 2007
THOMAS K. KAHN
CLERK

BIA Nos. A96-101-631 & A96-101-630


RUTH SOCORRO SANCHEZ JIMENEZ,
JOSE ANTONIO ELJACH MONTOYA,
CALEB JESUE ELJACH SANCHEZ,
GHISELA LINETTE ELJACH SANCHEZ,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

**(July 17, 2007)**

Before ANDERSON, MARCUS and COX, Circuit Judges.

MARCUS, Circuit Judge:

Jose Antonio Eljach Montoya ("Montoya") and his daughter Ghisela Linette Eljach Sanchez ("Ghisela") petition this Court for review of the denial of their applications for asylum, withholding of removal, and relief under the Convention Against Torture (CAT).[1] The Immigration Judge (IJ) denied relief, and the Board of Immigration Appeals (BIA) affirmed. After thorough review, the record compels us to conclude that Montoya suffered past persecution on account of his political opinion. Accordingly, we vacate the denial of his asylum application and the order of removal and remand for a determination whether it would be reasonable for him to avoid future persecution by relocating within Colombia. We dismiss Ghisela's petition for review of the denial of her asylum application for lack of appellate jurisdiction because the IJ determined that she failed to file before the statutory deadline. As for Ghisela's application for withholding of removal, it was denied based on the IJ's determination that Montoya was ineligible for asylum. Because we vacate the denial of Montoya's asylum application, we likewise vacate the denial of Ghisela's application for withholding of removal and

_____

[1] Montoya's wife, Ruth Socorro Sanchez Jimenez, and their minor son, Caleb Jesue Eljach Sanchez, are riders on Montoya's application. Their daughter Ghisela applied separately because she was too old to be included as a rider on Montoya's application. The Immigration Judge consolidated Montoya's and Ghisela's applications because they rest on the same factual foundation. (Admin. Rec. 87.) When we refer to Montoya in this opinion, we also include his wife and son.

her order of removal and remand for further proceedings consistent with this opinion. Finally, we deny Montoya's and Ghisela's petitions for review of the denial of relief under the CAT.

## I. Background

The Petitioners are natives and citizens of Colombia. They lived in the port city of Barranquilla, the capital of the Atlantico Department in northern Colombia, where, since September 1987, Montoya owned and operated a company that distributed oil, lubricants, and other products throughout the country. Montoya was a member of Colombia's Conservative Party, and he used a network of business contacts he cultivated during frequent business trips to help Conservative Party candidates get elected. Montoya's daughter Ghisela was also politically active, and, beginning in 1996, she became involved in various Conservative Party youth groups. In June 1999, both Montoya and Ghisela began working on the campaign of Lourdes Insignares, a Conservative Party candidate for the Atlantico Department Assembly. In addition to encouraging his business contacts in various cities and towns to support Insignares, Montoya provided logistical support, worked to reunite supporters throughout the region, helped mobilize voters, and provided transportation to the polls. (Admin. Rec. 44-45.)

Montoya's first encounter with the Revolutionary Armed Forces of Colombia (FARC) was on November 17, 1999. That day, the FARC contacted Montoya at home[2] and told him to leave the Conservative Party and back the FARC. They also demanded that he finance the FARC. In the ensuing weeks, the FARC continued to threaten Montoya by telephone. Around this time, Ghisela also began receiving threatening phone calls from FARC members. They threatened to kill her and her family if she, too, did not leave the Conservative Party and support the FARC, and they also demanded that her father finance the FARC. On December 27, 1999, Montoya reported the FARC's threats to government security forces. Thereafter, security forces conducted an investigation and were able to trace some of the threatening telephone calls, and, on February 21, 2000, they arrested three FARC members at Ghisela's university in Barranquilla. (Id. at 45.)

Less than two weeks after the arrest, however, the threats resumed -- and intensified. In addition to being told to leave the Conservative Party, Montoya was informed that he, Ghisela, and the rest of his family had been declared "military objectives" -- meaning that the FARC had marked them for death -- because

_____

[2] The record is unclear about whether, on November 17th, the FARC threatened Montoya by calling him on the telephone or by visiting him at his house. The IJ's decision states that Montoya "received a phone threat from individuals who called him at his house." (Admin. Rec. 45.) But Montoya's testimony was that on that date the FARC "started to come to my house," (id. at 104), and both parties' briefs state that this threat was made by several FARC members who came to Montoya's house (Petitioners' Br. 6; Respondent's Br. 7). Regardless, the manner in which these initial threats were communicated does not change our analysis.

Montoya had caused three FARC members to be sent to jail. After receiving four or five threatening telephone calls, Montoya removed Ghisela from the university in Barranquilla and sent her to a university in Bogota, which is some 450 miles, or about a 45-minute flight, from Barranquilla. But on May 10th, 2000, less than two months after Ghisela's relocation, several FARC members attempted to kidnap her at the university in Bogota. Ghisela was able to escape somehow,[3] and Montoya was later called by FARC members who claimed responsibility for the kidnapping attempt. Shortly thereafter, on May 20th, Montoya sent Ghisela to the United States. (Id. at 46.)

Montoya remained in Colombia with his family and continued to receive threatening telephone calls at home from the FARC. Then, on November 14, 2000, two armed men on motorcycles began following Montoya as he drove home alone from a meeting with Insignares, who by then had been elected. Montoya accelerated to get away from them, and the motorcyclists opened fire. He evaded the motorcyclists, and when he arrived home, he discovered several bullet holes in his car. (Id. at 47, 109-10.) Four days later, on November 18, 2000, Montoya and his family fled Colombia and entered the United States on tourist visas. Montoya returned to Colombia alone two weeks later to care for his mother, who was

---

[3] Ghisela did not testify before the IJ, but in her application, she stated that she escaped by running away and slipping into a group of students as they were getting out of classes. (Admin. Rec. 308.)

suffering from a long illness. He testified that while he was there he remained locked in his house and continuously received threats from the FARC. His mother passed away nearly two years later, and Montoya returned to the United States on September 19, 2002.[4] (Id. at 159.)

Montoya applied for asylum, withholding of removal, and relief under the Convention Against Torture on November 1, 2002. Ghisela, who had been in the United States continuously since May 20, 2000, filed a separate application on November 19, 2002. At a hearing before the IJ, Montoya testified as to the events described above. Ghisela did not testify, but the government stipulated that her testimony would have been essentially identical to Montoya's. (Id. at 43.)

The IJ denied the Petitioners' applications in an oral decision on December 15, 2005. The IJ found that Montoya's testimony was credible and consistent with his application, but that he was not eligible for asylum because he had failed to establish either past persecution or a well-founded fear of future persecution on account of one of the statutorily protected grounds. Although the IJ began his decision by summarizing Montoya's testimony, including the attempted kidnapping of Ghisela and the attempted shooting of Montoya, the IJ's subsequent legal analysis made no mention of either incident:

---

[4] During the time that Montoya was in Colombia, he visited the United States once, from December 19, 2001, to January 10, 2002. (Admin. Rec. 159.)

> Mere threats generally do not rise to the level of persecution within the meaning of the [Immigration and Nationality] Act. In this case, the Court shows that respondent was not physically harmed. He received threatening phone calls during the course of his time in Colombia. While the Court does not condone the receipt[5] of threatening phone calls, the Court finds that under the 11th Circuit and Board [of Immigration Appeals] precedent, the threats directed at respondents are not so severe as to rise to the level of persecution within the meaning of the Act.

(Id. at 48-49.)

As for a well-founded fear of future persecution, the IJ found that Montoya failed to establish that such persecution would be on account of one of the statutorily protected grounds, noting that "it is unclear that the fear of the threats in this case is . . . on the basis of [the Petitioners'] political opinion or a ground protected under the Act." (Id. at 49.) Rather, the IJ concluded that "the FARC was interested in [Montoya] because of their need to raise money" and that "the record does not establish that the FARC sought to harm [Montoya] because of his political activities." (Id. at 50.) The IJ also determined that Montoya failed to show that he could not relocate elsewhere in Colombia without fear of future persecution, and that Montoya's testimony that three FARC members had been arrested following his complaint to state security forces "undermines his claim . . . . that the FARC presents a threat to him countrywide." (Id. at 51.)

---

[5] We assume that the IJ meant to say that he does not condone the making of threatening phone calls.

7

The IJ denied Ghisela's asylum application because she failed to file within one year of entering the United States as required by statute. (Id. at 48.) The IJ also noted that even if she had filed on time, her application would have been denied for the same reasons he denied Montoya's application. (Id. at 51.) Because Montoya and Ghisela had failed -- or, in Ghisela's case, would have failed -- to establish a "well-founded fear" of future persecution to qualify for asylum, the IJ denied their applications for withholding of removal, which requires meeting the more difficult standard of showing that such persecution would be "more likely than not." Finally, the IJ denied their applications for relief under the CAT because the CAT applies only to torture committed by or with the acquiescence of government authorities, and, the IJ found, there was no evidence of that in this case. (Id. at 52-53.)

Montoya and Ghisela appealed to the BIA. The BIA summarily affirmed and adopted the IJ's decision denying Montoya's application. (Id. at 2, 263, 280.[6]) The BIA dismissed Ghisela's appeal in a short per curiam opinion, noting that the IJ correctly determined that her asylum application was time-barred. The BIA also affirmed the IJ's finding that Ghisela "failed to meet her burden of proof in demonstrating that she suffered past persecution or has a well founded fear of

---

[6] The BIA issued separate opinions for Montoya, his wife, and his son. Each opinion affirms and adopts the IJ's decision pursuant to the regulations permitting summary affirmance. See 8 C.F.R. § 1003.1(e)(4).

persecution upon return to Colombia." (Id. at 291.) Thereafter, Montoya and Ghisela timely petitioned this Court to review their applications for asylum, withholding of removal, and relief under the CAT.

## II. Discussion

A. *Standard of Review*

"A factual determination by the BIA that an alien is statutorily ineligible for asylum or withholding is reviewed under the substantial evidence test." Al Najjar v. Ashcroft, 257 F.3d 1262, 1283 (11th Cir. 2001). Under this test, "we view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc). Accordingly, "findings of fact made by administrative agencies, such as the BIA, may be reversed by this court only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Id. Indeed, we "must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Al Najjar, 257 F.3d at 1284 (quotation marks omitted). "When . . . the BIA issues its own opinion, we review only the decision of the BIA, except to the extent the BIA expressly adopts the IJ's decision." Rodriguez Morales v. U.S. Att'y Gen., ___

9

F.3d \_\_\_, No. 06-14911, slip op. at 10 (11th Cir. June 6, 2007) (per curiam). But when the BIA summarily affirms the IJ's decision pursuant to 8 C.F.R. § 1003.1(e)(4), "we review the IJ's decision as if it were the BIA's." Scheerer v. U.S. Att'y Gen., 445 F.3d 1311, 1315 (11th Cir. 2006).

B. *Appellate Jurisdiction*

We review de novo our subject-matter jurisdiction. Ruiz v. Gonzales, 479 F.3d 762, 765 (11th Cir. 2007). Among other things, the Immigration and Nationality Act (INA) provides that an alien applying for asylum must demonstrate "by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States." 8 U.S.C. § 1158(a)(2)(B) (2005). Although an untimely asylum application can be considered in "extraordinary circumstances," id. § 1158(a)(2)(D), the INA expressly provides that "[n]o court shall have jurisdiction to review any determination of the Attorney General under [section 1158(a)(2)]," id. § 1158(a)(3). We have held that section 1158(a)(3) eliminates appellate jurisdiction to review the Attorney General's determination whether an alien filed within one year or established extraordinary circumstances to excuse an untimely filing. Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003); see also Chacon-Botero v. U.S. Att'y Gen., 427 F.3d 954, 957 (11th Cir. 2005) (holding that the REAL ID Act of 2005 did not

10

undermine the conclusion that federal appeals courts lack jurisdiction to review application timeliness determinations under section 1158(a)(2)).

Here, the IJ determined that Ghisela was not eligible for asylum because she did not file her application within one year of her arrival in the United States and, the IJ found, there was "no evidence or indication in the record" explaining her delay.[7] (Admin. Rec. 48.) Accordingly, under section 1158(a)(3), this Court lacks jurisdiction over Ghisela's petition for review of the denial of her asylum application, and we dismiss that part of her petition for review.

C. *Montoya's Asylum Application*

To be eligible for asylum, an applicant bears the burden of proving that he is a "refugee" within the meaning of the INA. 8 U.S.C. § 1158(b)(1)(A); Chen v. U.S. Att'y Gen., 463 F.3d 1228, 1231 (11th Cir. 2006) (per curiam). In relevant part, the INA defines a "refugee" as

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling

___

[7] We note that some evidence in the record does appear to explain why Ghisela applied more than one year after arriving in the United States. She stated in her asylum application that she applied late "due to the extreme situation that I lived in Colombia I began to suffer a nervous crisis that destabilized me emotionally until the point of not knowing how to solve my situation." (Admin. Rec. 305.) One of the extraordinary circumstances that "may excuse" an untimely filing is "[s]erious illness or mental or physical disability, including any effects of persecution or violent harm suffered in the past, during the 1-year period after arrival." 8 C.F.R. § 208.4(a)(5)(i). Although the IJ's finding that the record contains "no evidence or indication" why Ghisela delayed could be read to suggest that the IJ overlooked her explanation, we express no opinion as to that or whether her explanation would qualify as an extraordinary circumstance because we are without power to review the IJ's determination of this issue.

to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). Thus, an applicant can prove refugee status by presenting "specific and credible evidence" of either past persecution or fear of future persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion." Scheerer, 445 F.3d at 1315.

"To establish asylum based on past persecution, the applicant must prove (1) that she was persecuted, and (2) that the persecution was on account of a protected ground." Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1236 (11th Cir. 2006) (emphasis added). "To establish eligibility for asylum based on a well-founded fear of future persecution, the applicant must prove (1) a subjectively genuine and objectively reasonable fear of persecution that is (2) on account of a protected ground." Id. (emphasis added, citations and quotation marks omitted). "The subjective component is generally satisfied by the applicant's credible testimony that he or she genuinely fears persecution. In most cases, the objective prong can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." Al Najjar, 257 F.3d at 1289 (citation and quotation marks omitted). A showing of past persecution creates a rebuttable presumption of a well-founded fear of future persecution. Sepulveda v. U.S. Att'y Gen., 401 F.3d

12

1226, 1231 (11th Cir. 2005) (per curiam). To overcome this presumption, the government bears the burden to show by a preponderance of the evidence either that conditions in the country have changed or that the applicant could avoid future persecution by relocating within the country if, "under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R. § 208.13(b)(1)(i)(B); accord Arboleda v. U.S. Att'y Gen., 434 F.3d 1220, 1223 (11th Cir. 2006) (per curiam).

Although the INA does not define "persecution," we have often repeated that "persecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and that mere harassment does not amount to persecution." Sepulveda, 401 F.3d at 1231 (quotation marks and brackets omitted); accord Yi Feng Zheng v. U.S. Att'y Gen., 451 F.3d 1287, 1290 (11th Cir. 2006) (per curiam); see also Gonzalez v. Reno, 212 F.3d 1338, 1355 (11th Cir. 2000) ("Not all exceptional treatment is persecution.").

Both past persecution and future persecution must be "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(42)(A). One of those five grounds need not be the only motivation for the persecution. Rather, it is by now well-established in our case law that an applicant can establish eligibility for asylum as long as he can show that the persecution is, "at least in part, motivated by a protected ground." Rivera v. U.S.

13

Att'y Gen., 487 F.3d 815, 821 (11th Cir. 2007) (emphasis added); see also Tan v.

U.S. Att'y Gen., 446 F.3d 1369, 1375 (11th Cir. 2006) ("If the applicant can show

that the persecution was, at least in part, motivated by a protected ground, then the

applicant can establish eligibility for withholding of removal." (emphasis added));[8]

Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 438 (11th Cir. 2004) (per curiam)

("[M]ixed-motive persecution may qualify if one of the motives is political."

(citation omitted)). At least seven other circuits have reached the same conclusion.

See Borja v. INS, 175 F.3d 732, 735-36 (9th Cir. 1999) (en banc); Menghesha v.

Gonzales, 450 F.3d 142, 148 (4th Cir. 2006); Mohideen v. Gonzales, 416 F.3d 567,

570 (7th Cir. 2005); De Brenner v. Ashcroft, 388 F.3d 629, 636 (8th Cir. 2004);

Girma v. INS, 283 F.3d 664, 667 (5th Cir. 2002) (per curiam); Chang v. INS, 119

F.3d 1055, 1065 (3d Cir. 1997); Osorio v. INS, 18 F.3d 1017, 1028-29 (2d Cir.

1994); see also In re S-P-, 21 I. & N. Dec. 486, 492-95 (BIA 1996).[9] Thus, as long

as an applicant can show that the persecution was motivated at least in part by a

protected ground, the applicant can establish eligibility for asylum. Rivera, 487

F.3d at 821; see also Tan, 446 F.3d at 1375.

_____

[8] Although Tan is a withholding of removal case, we explained in Rivera that "[b]ecause the burden of proof to establish eligibility for asylum is lower than the burden of proof to establish a right to withholding of removal, it follows that mixed-motive persecution establishes eligibility for asylum as well." 487 F.3d at 821.

[9] The First, Sixth, Tenth, and D.C. Circuits do not appear to have addressed the issue.

14

We come, then, to the first issue in this appeal: whether under the facts and circumstances of this case -- including the FARC's attempt to murder Montoya by shooting at his moving vehicle and to kidnap his daughter -- the record compels a finding that Montoya suffered past persecution. We have little difficulty in holding that it does. Montoya testified that the FARC's death threats began in November 1999. Montoya reported the threats to government security forces, which led to the arrest of three FARC members. But less than two weeks later, the telephone calls resumed, except this time, the FARC expressly told Montoya that he was a "military objective," thereby marking him, Ghisela, and the rest of his family for death.

Montoya moved Ghisela to a university in Bogota to keep her safe from the FARC, but to no avail -- within two months they located and attempted to kidnap her in Bogota. Montoya then sent Ghisela to the United States, but the FARC's death threats to Montoya and his family only became more frequent. Finally, as Montoya was driving home from a meeting with a political associate, Insignares, two armed FARC members on motorcycles followed him and shot at him multiple times while he was driving. Bullets struck the car but Montoya escaped injury. Soon after the incident, the FARC again called Montoya and specifically took responsibility for the shooting. The IJ described this testimony and found it credible. (Admin. Rec. 47-48.)

15

This undisputed record, we think, fairly compels the conclusion that Montoya suffered past persecution. The FARC repeatedly told Montoya that they would try to kill him, Ghisela, and his family. The FARC had already tried to kidnap Ghisela, and sending her halfway across the country could not keep her safe. We have said that persecution is an "extreme" concept. Sepulveda, 401 F.3d at 1231. We have no difficulty concluding that intentionally being shot at in a moving car multiple times by two armed men on motorcycles qualifies as "extreme" under any definition. Put simply, attempted murder is persecution. See, e.g., Deloso v. Ashcroft, 393 F.3d 858, 860 (9th Cir. 2005) (finding past persecution when, within a two year span, applicant was shot at, attacked by a group of men with knives, and set upon by a man armed with a pipe); Fergiste v. INS, 138 F.3d 14, 17-18 (1st Cir. 1998) (affirming the BIA's finding of past persecution where applicant had been shot in the shoulder and his aunt had been killed).

In concluding that Montoya had failed to establish past persecution, the IJ omitted the details of the shooting from his legal analysis, instead focusing on the fact that Montoya "was not physically harmed." (Id. at 49.) But the observation that Montoya fortuitously escaped from the shooters unharmed does not undermine the basic conclusion that being shot at while driving is sufficiently "extreme" to constitute persecution. And while the government argues that there was no

16

evidence of any intent to harm Montoya and his family, the notion that the two armed men on motorcycles were just trying to "personally contact" Montoya when they riddled his car with bullets strains credulity. (See Respondent's Br. 20-21.) The motorcyclists' poor marksmanship does not undermine this conclusion.

In Silva, a panel of this Court only assumed that being shot at constitutes persecution, but did not decide the issue because the evidence in that case did not compel the conclusion that the shooting was undertaken on account of a statutorily protected ground. 448 F.3d at 1238. Here, as we detail below, the record compels the conclusion that the FARC fired at Montoya specifically on account of his political opinion. We therefore decide today what Silva left open: that Montoya suffered past persecution when two FARC members on motorcycles followed him and intentionally shot at him in his moving car. See id. at 1246 (Carnes, J., dissenting) (stating that being shot at is persecution, "especially when the attempted murder is preceded by a written threat to kill the victim because of her political activities and by an almost daily barrage of threatening phone calls . . . .").[10]

---

[10] In Sepulveda, which has been cited to us by the government, a panel of this Court declined to find past persecution because, although a bomb was detonated in a restaurant where the applicant worked shortly after her shift ended, the evidence did not compel the conclusion that the bomb was "directed at" the applicant. 401 F.3d at 1231. Sepulveda is factually distinguishable. Although Sepulveda believed that the bomb was related to her political activities, there appears to have been no evidence of the reason for the bombing. See id. at 1229. Here, by contrast, the record compels the conclusion that the motorcyclists' shooting was directed at Montoya. Again, Montoya testified that the FARC later called him and claimed

17

Indeed, the Supreme Court has observed that a well-founded fear of future persecution can exist even if the applicant "only has a 10% chance of being shot, tortured, or otherwise persecuted." INS v. Cardoza-Fonseca, 480 U.S. 421, 440 (1987) (emphasis added). If a 10% chance of being shot at some unspecified time may constitute a well-founded fear of future persecution, then an applicant's credible testimony that he was intentionally and repeatedly fired upon surely constitutes past persecution. Simply put, the IJ's determination on this point was not supported by reasonable, substantial, and probative evidence on the record considered as a whole.

As for the corollary question -- whether the FARC persecuted Montoya "on account of" a statutorily protected ground -- we likewise conclude that the record compels an affirmative answer. The IJ determined that "the FARC was interested in [Montoya] because of their need to raise money" and that, therefore, "the record does not establish that the FARC sought to harm [Montoya] because of his political activities." (Admin. Rec. 50.) We disagree. Although the FARC did demand financial support from Montoya, the record as a whole compels the conclusion that the FARC also targeted Montoya because of his political activities. Montoya had been a successful businessman since 1987, but the FARC did not begin threatening

---

responsibility for the shooting and reiterated their intention to kill him and his family. (Admin. Rec. 110.)

18

him and Ghisela until November 17th, 1999, just five or six months after they started working on the Insignares campaign. Indeed, the undisputed record established that Montoya supported many Conservative Party candidates for office, encouraged his business contacts in various cities and towns to do so as well, and provided extensive logistical support for the party over an extended time frame.

Moreover, the investigator's report, written when Montoya complained to government security forces about the FARC's threats, mentions nothing about the FARC's financial demands. Rather, the report expressly details only the FARC's political demands. Montoya told the government investigator that "people that have called to [his] house . . .[and] tried to intimidate [him] in a vulgar way to [separate him]self from . . . political activities," that he should stop supporting Insignares or he would "regret it," that "they knew where [his] daughter studied and that she was an easy target for them," and that "they had a presence" at her university. (Id. at 170.) In fact, the only evidence in the record of the FARC's financial demands indicates that those demands were limited to their initial threats of Montoya and Ghisela in November 1999. Even then, the financial demands seem almost an afterthought, and they were expressly accompanied by repeated references to and threats concerning Montoya's and Ghisela's association with the Conservative Party. (Id. at 104, 168-69, 308.)

19

Moreover, the FARC's financial interest in Montoya in no way undermines the conclusion, compelled by the record, that they also targeted him because of his political activities. See Borja, 175 F.3d at 735 ("[T]he conclusion that a cause of persecution is economic does not necessarily imply that there cannot exist other causes of the persecution." (quoting Osorio, 18 F.3d at 1028)). Our case law is crystal clear on this point: Montoya is eligible for asylum as long as "at least one motivation" for the FARC's persecution of Montoya was on account of his political activities. See Rivera, 487 F.3d at 821; Tan, 446 F.3d at 1375; see also Sanchez, 392 F.3d at 438. In short, although there is evidence that the FARC demanded financial support from Montoya, the record as a whole compels the conclusion that for an extended period of time the FARC targeted Montoya, at least in part, on account of his political activities.

To further support his conclusion that the FARC did not target Montoya on account of his political activities, the IJ found that (1) Montoya held a "relatively minor position within the Conservative Party"; (2) Insignares, the candidate for whom Montoya worked, "was never seriously threatened at all by the FARC"; and (3) that there was "no evidence that any others who occupy a similar position as did [Montoya] were ever threatened." (Admin. Rec. 49-50.) These findings do not support the IJ's conclusion. First, we think it is irrelevant whether Montoya's position in the Conservative Party was in fact "minor" if indeed the FARC found

20

his political role significant enough to attempt to kill him, as they plainly did.

Second, we fail to see the relevance of the FARC's interactions with Insignares or other Conservative Party members similarly situated to Montoya because we can discern no requirement in the case law or in common sense that an applicant show that others who engaged in the same political activities were similarly persecuted.

But, perhaps more importantly, the record almost completely contradicts each of the IJ's findings. On the question of Montoya's importance, the record contains two signed letters from Conservative Party officials addressed to Montoya. One is a letter from Insignares herself thanking Montoya and Ghisela for their considerable help on the campaign and expressing regret that the "rebel forces" obligated them to leave. (Id. at 173.) The second letter is from a Conservative Party official thanking Montoya for his "participation as a leader in the last campaign." (Id. at 176 (emphasis added); see also id. ("We lament[] your retirement from our[] organization but we understand that [the] threats and . . . attacks against you and your family is a powerful motive . . . .").). As for whether the FARC ever threatened Insignares, all that the record shows is that Montoya did not know whether Insignares was ever threatened:

Q.    Do you know if Lourdes Insignar[e]s had any problems with
       the FARC or any guerilla groups?
A.    No. . . .

21

Q.   Sir, your testimony is that the FARC were threatening you, and they didn't threaten Lourdes, who is the person you were seeking to have elected?
A.   Because they saw me in a voting power.
Q.   Sir, your testimony is that they saw you as more of a threat than Lourdes herself?
A.   No.
Q.   Well, why would they threaten you and not Lourdes, sir?
A.   <u>I don't know about any with Lourdes because she didn't give me any details about it.</u>

(<u>Id.</u> at 110, 112 (emphasis added).)

Finally, as for the IJ's finding that there was "no evidence that any others who occupy a similar position as did [Montoya] were ever threatened," (<u>id.</u> at 50), Montoya testified unambiguously that others in the Conservative Party in fact were threatened:

Q.   Sir, do you know if they threatened anyone else who helped Lourdes get elected?
A.   Yes.
Q.   Who else did they threaten?
A.   They threatened other candidates. Some of them they made 'em get out of the movement. They . . . threatened, they made mayors resign.

(<u>Id.</u> at 112-13.) In sum, we can find no record evidence, let alone substantial evidence, to support the IJ's conclusion that the FARC's persecution of Montoya was not on account of his political opinion. This record compels the conclusion that at least one of the FARC's motivations (and a powerful one at that) for targeting Montoya was precisely on account of his political opinion.

22

We next turn to the question whether Montoya can avoid future persecution by relocating within Colombia. The IJ found that Montoya "never attempted to relocate elsewhere in Colombia," and that there was "no evidence to support [Montoya's] claim that the FARC has the ability to harm him on account of his political opinion throughout . . . Colombia." (Id. at 50-51 (emphasis added).) Our review of the record, however, indicates that the IJ does not seem to have considered substantial evidence supporting the conclusion that Montoya could not relocate.

The Supreme Court has instructed that, when the IJ or BIA has not made findings of fact or has not applied the law to those facts, appellate courts should remand to allow the IJ to make such determinations in the first instance. See INS v. Ventura, 537 U.S. 12, 16-17 (2002) (per curiam) ("[A] court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands. This principle has obvious importance in the immigration context."); see also Gonzales v. Thomas, 126 S. Ct. 1613, 1615 (2006) (per curiam) ("A court of appeals is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry. Rather, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." (quotation marks omitted)). And the general practice in this circuit is to remand when the IJ or BIA

23

fails to make "adequate findings" or give "reasoned consideration" to all the evidence. Tan, 446 F.3d at 1377 (quotation marks omitted); see also Mezvrishvili v. U.S. Att'y Gen., 467 F.3d 1292, 1297 (11th Cir. 2006) (per curiam) (remanding because "the BIA and the Immigration Judge failed to render a reasoned decision"); Antipova v. U.S. Att'y Gen., 392 F.3d 1259, 1265 (11th Cir. 2004) (remanding because "the absence of [a] reasoned discussion . . . undercuts any meaningful review" (citation omitted)).

We remand this case to allow the IJ to determine whether Montoya can relocate within Colombia. That determination should be made in light of our holding today that Montoya has established past persecution on account of his political activities. As such, he is entitled to a presumption of future persecution. The government may rebut this presumption by showing, by a preponderance of the evidence, that Montoya could avoid future persecution by relocating within Colombia if, under all the circumstances, it would be reasonable to expect him to do so.[11] See Arboleda, 434 F.3d at 1223; 8 C.F.R. § 208.13(b)(1)(i)(B).

Among the pieces of evidence the IJ does not appear to have considered concerning whether Montoya could relocate are these. The U.S. Department of

---

[11] The government can also rebut this presumption by showing that conditions in the applicant's country have changed. Arboleda, 434 F.3d at 1223. Here, however, the government does not argue, and there is no evidence in this record, that conditions in Colombia have changed to the extent that the FARC would no longer target Montoya if he returned to Colombia.

State Country Reports on Human Rights Practices for 2002 and 2004 contained in the record describe the FARC's violent activities throughout Colombia. Thus, for example, the 2002 Report says that after the election of President Alvaro Uribe that year, the FARC attempted "to destabilize the country prior to Uribe's inauguration" by threatening "all local elected officials throughout the country." (Id. at 147 (emphasis added).) Likewise, the 2004 Report observes that "Guerrillas, particularly the FARC, committed hundreds of intentional illegal killings" as well as politically motivated kidnappings throughout the country. (Id. at 226, 230-31.) In fact, this Court recently concluded that "the FARC has a presence in virtually all of the nation's 32 departments and urban centers and has a country-wide capability to harm."[12] Ruiz, 479 F.3d at 767; see also Arboleda, 434 F.3d at 1224 n.2 ("It is undisputed that the FARC is the largest and most widespread of any guerrilla group in Colombia.").

Perhaps the most significant piece of evidence that the IJ does not appear to have considered is that although Montoya himself never tried to relocate within Colombia, his daughter Ghisela -- who was marked for death by the FARC for the same reasons as Montoya -- did. On March 15, 2000, Montoya removed Ghisela

---

[12] The Court in Ruiz was quoting a U.S. Citizenship and Immigration Services report that was in the record in that case. 479 F.3d at 767. While our review here is confined to the record before us, it may be difficult for the government to establish on remand in this case, less than six months after our observation in Ruiz, that the FARC no longer has a "country-wide capability to harm." See id.

from the university in Barranquilla and sent her to study in Bogota, which is some 450 miles away, or about a 45-minute flight, from Barranquilla. Nevertheless, it took the FARC little more than six weeks to locate her. Ghisela stated in her application that on May 2nd she began to receive threatening telephone calls from the FARC in Bogota. (Admin. Rec. 308.) And eight days later, on the evening of May 10th, the FARC attempted to kidnap her in Bogota as she left the university. (Id. at 46.) The fact that the FARC attempted to kidnap Ghisela despite her relocation to Bogota is clear evidence of both the FARC's interest in her and the extent of their reach.

Because the IJ failed to render a reasoned decision regarding the efficacy of internal relocation and does not appear to have considered the evidence in the record, we cannot meaningfully review the IJ's determination on that issue.[13] Accordingly, we remand the case to the IJ for further review and to make a determination in the first instance whether relocation is both possible and reasonable.[14] See Arboleda, 434 F.3d at 1226.

---

[13] The IJ also found that the arrest of three FARC members as a result of Montoya's complaint to government security forces "undermines his claim that the FARC . . . is an organization which the present government of Colombia is unable or unwilling to control" and his claim that "the FARC presents a threat to him countrywide." (Admin. Rec. 51.) On remand, however, the IJ should consider the arrest of the three FARC members in light of the record as a whole, including the evidence that the arrest spurred the FARC to expressly mark the family for death, to attempt to kidnap Ghisela, and to attempt to murder Montoya.

[14] In assessing reasonableness, the IJ should consider these factors: "whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil

D. *Ghisela's Application for Withholding of Removal*

To be entitled to withholding of removal, an alien must establish that her "life or freedom would be threatened . . . because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). "The alien bears the burden of demonstrating that it is 'more likely than not' she will be persecuted or tortured upon being returned to her country." Sepulveda, 401 F.3d at 1232 (quoting Fahim v. U.S. Att'y Gen., 278 F.3d 1216, 1218 (11th Cir. 2002) (per curiam)). "If the alien establishes past persecution in his country based on a protected ground, it is presumed that his life or freedom would be threatened upon return to his country . . . ." Mendoza, 327 F.3d at 1287. The burden then shifts to the government to establish by a preponderance of the evidence either that the country's conditions have changed, or "that the alien could avoid a future threat to his life or freedom by relocating to another part of the proposed country of removal, and [that] it would be reasonable to expect him to do so." Id.; see also 8 C.F.R. § 208.16(b)(1)(i).

---

strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties." 8 C.F.R. § 208.13(b)(3); see also Arboleda, 434 F.3d at 1226. For example, this Court has considered "not only the fact that the guerillas exercised influence throughout the country, but also that the numbers of internally displaced people due to the civil war and the violence and the resulting scarcity of health care, education, and employment would make it unreasonable for the petitioners to relocate." Arboleda, 434 F.3d at 1226 (discussing Sepulveda, 401 F.3d at 1232 n.7).

27

An alien who cannot show past persecution can still qualify for withholding of removal by showing that it is "more likely than not" that she will be persecuted on account of a protected ground. Mendoza, 327 F.3d at 1287; 8 C.F.R. § 208.16(b)(2). "An alien cannot demonstrate that she more-likely-than-not would be persecuted on a protected ground if the IJ finds that the alien could avoid a future threat by relocating to another part of her country." Tan, 446 F.3d at 1375 (quotation marks and brackets omitted); see also 8 C.F.R. § 208.16(b)(2). Because the "more likely than not" standard is more stringent than the "well-founded fear" standard for asylum, an applicant unable to meet the "well-founded fear" standard is generally precluded from qualifying for either asylum or withholding of removal. Sepulveda, 401 F.3d at 1232-33.

Here, the IJ denied Ghisela's application for withholding of removal based upon his conclusion that she would not have established the less stringent standard for asylum had she applied on time. (Id. at 51-53.) The BIA affirmed the IJ's decision in a brief per curiam opinion. Because we vacate the denial of Montoya's asylum application, having found that this record compels the conclusion that he was persecuted on account of political opinion, we must also vacate the denial of Ghisela's application for withholding of removal. Neither the IJ nor the BIA had occasion to consider her application for withholding of removal independently, and, as we have already explained, the appropriate course of action is to remand

28

the case to allow the IJ to decide the issue in the first instance. See Thomas, 126 S. Ct. at 1615; Ventura, 537 U.S. at 16-17; see, e.g., Lopez v. U.S. Att'y Gen., ___ F.3d ___, No. 06-12907, slip op. at 8-10 (11th Cir. July 6, 2007) (remanding to allow the IJ and BIA to address issues that they initially had no occasion to reach). Accordingly, we vacate the BIA's decision and Ghisela's order of removal and remand for a determination whether Ghisela is entitled to withholding of removal.

E. *Convention Against Torture*

To be eligible for relief under the CAT, an applicant must establish "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. §§ 208.16(c)(2). The regulations plainly require that such torture be "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." Id. § 208.18(a)(1). Here, it is undisputed that the FARC's conduct was not by, at the instigation of, or with the consent or acquiescence of Colombian government authorities. See Reyes-Sanchez v. U.S. Att'y Gen., 369 F.3d 1239, 1242-43 (11th Cir. 2004) (holding that a government that unsuccessfully attempts to apprehend those responsible for torture does not "acquiesce" to torture). Accordingly, we deny Montoya's and Ghisela's petition for review of the denial of relief under the CAT.

III.  Conclusion

29

In sum, we vacate the IJ's determination, affirmed by the BIA, that Montoya is ineligible for asylum and withholding of removal, and we vacate his order of removal; we dismiss Ghisela's petition for review of the denial of her asylum application, but we vacate the BIA's decision that she is not entitled to withholding of removal, and we vacate her order of removal; we deny Montoya's and Ghisela's petitions for review of the denial of relief under the CAT; and we remand for further proceedings consistent with this opinion.

**PETITIONS GRANTED IN PART, DENIED IN PART, DISMISSED IN PART, and REMANDED.**