[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-12646
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 8, 2010
JOHN LEY
CLERK

Agency Nos. A078-616-508,
A078-616-509

CARLOS EDUARDO CABRERA-NORIEGA,
MARIA JOSE BOTERO-DE CABRERA,
MARIA ANDREA CABRERA-BOTERO,
JUAN ESTEBAN CABRERA-BOTERO,
ANA SOL BOTERO,
NATALIA REMOLINA-BOTERO,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(March 8, 2010)

Before BARKETT, HULL and FAY, Circuit Judges.

PER CURIAM:

Carlos Eduardo Cabrera-Noriega and Ana Botero petition for review of the Bureau of Immigration Appeals's ("BIA's") decision affirming the Immigration Judge's ("IJ's") order denying their applications for asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). Cabrera-Noriega's wife, Maria Jose Cabrera-De Botero, and their two children, Maria Andrea Cabrera-Botero, and Juan Esteban Cabrera-Botero, appeal as derivative beneficiaries of Cabrera-Noriega's asylum application. Botero's daughter, Natalia Botero, appeals as a derivative beneficiary of Botero's asylum application. The petitioners argue that the IJ erred in finding that (1) Cabrera-Noriega's testimony was not credible, and (2) Cabrera-Noriega failed to demonstrate past persecution or a well-founded fear of future persecution. For the reasons set forth below, we deny the petition for review.

## I.

On January 19, 2001, Cabrera-Noriega, a native and citizen of Colombia, filed an application for asylum and withholding of removal. On February 14, 2002, Botero, Cabrera-Noriega's sister-in-law, also a native and citizen of Colombia, filed an asylum application. All of the petitioners were issued notices to appear, which charged that they were subject to removal under INA

2

§ 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), as non-immigrants who remained in the United States for a period longer than permitted. The petitioners admitted the allegations contained in the notices to appear and conceded removability. The IJ consolidated Cabrera-Noriega's and Botero's cases.

Cabrera-Noriega testified before the IJ that, while in Colombia, he had been a conservative party activist, campaigning for his uncle, a governor and member of the House, and Alvaro Gomez, a conservative party candidate for president. Cabrera-Noriega was also a member of the Junior Chamber, which he described as "a non-profit organization" with no political affiliation whose objective was "to help the people that need[] the most help, and poor people." Cabrera-Noriega also belonged to an organization known as "Free Country," which he described as "a nonprofit organization that helps the families of kidnaped people." As a coordinator for Free Country, Cabrera-Noriega held meetings and participated in marches.

Cabrera-Noriega explained that he was contacted by the Red Cross to act as a negotiator between Ejercito de Liberacion Nacional ("ELN") guerillas and the family of Allister Taylor, an English employee of a multinational corporation who the ELN had kidnaped in July 1999. He stated that the Red Cross asked him to help with Taylor's case because he was known as a person who provided humanitarian aid. On September 25, 1999, Cabrera-Noriega met with ELN

members at a Red Cross office. The ELN members drove Cabrera-Noriega two-and-a-half hours into the jungle, where they met a group of ten armed guerillas. An ELN commander took Cabrera-Noriega's personal information and told him that they would only deal with him in the future.

Cabrera-Noriega's second meeting with the guerillas occurred on October 13, 1999. The guerillas informed Cabrera-Noriega that they were seeking a $19 million ransom for Taylor's release. Taylor's family subsequently offered to pay $50,000. Cabrera-Noriega informed the guerillas of the family's offer, and the guerillas told him that they were willing to reduce the ransom to $8 million. Cabrera-Noriega met with the guerillas 11 times and the guerillas ultimately lowered their ransom demand to $2 million, although the family offered to pay only $600,000.

Cabrera-Noriega's last meeting with the guerillas was held on June 14, 2000. Cabrera-Noriega told the guerillas that Taylor's family was willing to pay $600,000. A commander told Cabrera-Noriega that "this is not a game, you son-of-a-bitch. You're staying here with us." Cabrera-Noriega was blindfolded, handcuffed with a chain, and thrown into a car. After a four-hour drive over an unpaved road, the men forced Cabrera-Noriega to walk for two-and-a-half hours. Cabrera-Noriega was chained to a post in a wooden cabin, where he remained for 24 days. The guerillas called Cabrera-Noriega an "oligarch and a son-of-a-bitch"

and told him that they were going to kill him and his family "for not cooperating." Cabrera-Noriega explained that, to the guerillas, an oligarch meant an individual with a social status and a better life. Cabrera-Noriega was eventually released under the condition that he would help secure Taylor's ransom. Cabrera-Noriega was told to return on July 24th "with a positive answer" and, if possible, with the $2 million ransom. Cabrera-Noriega returned to Bogota after the kidnaping on July 8, 2000, and left Colombia on September 3, 2000. From the time he was released until the time he left Colombia, Cabrera-Noriega received threatening phone calls from ELN guerillas, who told him that "no oligarch son-of-a-bitch was going to mock them," that he had been "declared a military target," and that they would not rest until Cabrera-Noriega was killed.

The IJ found that Taylor's testimony was not credible, based on discrepancies between his testimony and his asylum application. It also found that Cabrera-Noriega's account was implausible and that he failed to present corroborating documents from the Red Cross or Taylor's family, although it would have been reasonable to do so. The IJ denied Cabrera-Noriega's and Botero's applications based on the lack of credibility and corroborating evidence. The IJ found that, even if Cabrera-Noriega's claims were credible, he would not be eligible for relief because he failed to show that the actions taken against him were on account of his political opinion. Instead, the found that the ELN's actions were

5

based on Cabrera-Noriega's failure to obtain the ransom money. The IJ also determined that Cabrera-Noriega's kidnaping did not rise to the level of persecution because he was not physically injured. Finally, the IJ denied Cabrera-Noriega's and Botero's claim for CAT relief, finding that Cabrera-Noriega failed to show that the ELN was a public official or acted with the acquiescence or consent of Colombian officials.

Cabrera-Noriega and Botero appealed the IJ's denial of relief, arguing that the IJ erred by (1) determining that Cabrera-Noriega's testimony was not credible, (2) denying their applications for political asylum, (3) determining that they failed to meet their burdens of proof to establish that they were refugees, and (4) denying their applications for withholding of removal.

The BIA determined that all of the petitioners' claims, including those of Botero, rested on Cabrera-Noriega's claim. It determined that it was "unnecessary to address" the IJ's adverse-credibility finding because, even if Cabrera-Noriega's testimony was credible, the IJ did not err in determining that Cabrera-Noriega failed to establish eligibility for asylum and withholding of removal. The BIA found that the IJ did not clearly err in determining that Cabrera-Noriega's kidnaping and the subsequent threats were on account of his failure to obtain the ransom amount, rather than on account of his political opinion. It noted that the guerillas' comments that Cabrera-Noriega was an "oligarch," Cabrera-Noriega's

6

testimony that he was kidnaped because the ELN was angry about his failure to obtain the ransom, the fact that the ELN never mentioned Cabrera-Noriega's political opinions, and the fact that Cabrera-Noriega was released so that he could obtain the ransom money, indicated that the ELN's actions were based on their desire to obtain the ransom, rather than Cabrera-Noriega's political affiliation. Thus, the BIA affirmed the IJ's finding that Cabrera-Noriega failed to establish a nexus between the persecution he suffered and a protected ground.

The BIA also found that Cabrera-Noriega did not have a well-founded fear of future persecution on the basis of a protected ground because he was never harmed in Colombia, he failed to show that his affiliation with any political party or organization was so significant or well-known that he would still be targeted nine years after leaving the country, Taylor was released in 2001, and there was no evidence that the ELN continued to look for Cabrera-Noriega. Because Cabrera-Noriega failed to establish that he was entitled to asylum, the BIA found that he necessarily failed to meet his burden of proof with respect to his claim for withholding of removal. Finally, the BIA found that Cabrera-Noriega was not entitled to relief under the CAT because the IJ correctly found that it was not "more likely than not" that Cabrera-Noriega would be tortured if he returned to Colombia.

We review only the BIA's decision, except to the extent that the BIA expressly adopts the IJ's opinion or reasoning. *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001). Here, the BIA did not expressly adopt the IJ's order, so we review only the BIA's order. When reviewing an order of the BIA, we review legal issues *de novo*. *Hernandez v. U.S. Att'y Gen.*, 513 F.3d 1336, 1339 (11th Cir.), *cert. denied*, 129 S.Ct. 44 (2008). The BIA's factual findings are reviewed under the substantial-evidence test. *Al Najjar*, 257 F.3d at 1283. Under this test, we must affirm the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* at 1284.

**III.**

*Credibility of Cabrera-Noriega's Testimony*

We review credibility determinations under the substantial-evidence test. *Chen v. U.S. Att'y Gen.*, 463 F.3d 1228, 1230-31 (11th Cir. 2006). "The trier of fact must determine credibility, and [we] may not substitute [our] judgment for that of the BIA with respect to credibility findings." *D-Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 818 (11th Cir. 2005). The BIA must make "clean determinations of credibility," and, to be considered an adverse-credibility determination, the fact finder must state explicitly that the applicant's testimony was not credible. *Yang v.*

8

*U.S. Att'y Gen.*, 418 F.3d 1198, 1201 (11th Cir. 2005). If the BIA fails to make an explicit adverse-credibility determination, we accept the petitioner's testimony as credible. *Mejia v. U.S. Att'y Gen.*, 498 F.3d 1253, 1257 (11th Cir. 2007).

As discussed above, because the BIA did not expressly adopt the IJ's reasoning or opinion, we review only the BIA's order. *See Al Najjar*, 257 F.3d at 1284. The BIA's order did not make an express adverse-credibility determination but instead, analyzed Cabrera-Noriega's claims under the assumption that his testimony was credible. Accordingly, because the BIA did not make an express adverse-credibility determination, we accept Cabrera-Noriega's as credible. *See Mejia*, 498 F.3d at 1257.

### *Past Persecution or a Well-Founded Fear of Future Persecution*

An alien may establish eligibility for asylum if he shows that he has suffered either "past persecution" or has a "well-founded fear" of future persecution based on a protected ground. 8 C.F.R. § 208.13(b); *Tang v. U.S. Att'y Gen.*, 578 F.3d 1270, 1277 (11th Cir. 2009). "To establish asylum based on *past* persecution, the applicant must prove (1) that []he was persecuted, and (2) that the persecution was on account of a protected ground." *Sanchez Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1232 (11th Cir. 2007). A well-founded fear of future persecution may be established by showing (1) past persecution that creates a presumption of a "well-founded fear" of future persecution, (2) a reasonable possibility of being

9

singled out for persecution that cannot be avoided by relocating within the subject country, or (3) a pattern or practice in the subject country of persecuting members of a statutorily defined group of which he is a part. 8 C.F.R. § 208.13(b)(1), (2), (3)(i). "Both past persecution and future persecution must be 'on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Sanchez Jimenez*, 492 F.3d at 1232 (quoting INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A)).

An alien is entitled to withholding of removal under the INA if he can show that his life or freedom would be threatened on account of a protected ground. *Mendoza v. U.S. Att'y Gen.*, 327 F.3d 1283, 1287 (11th Cir. 2003). This standard is more stringent than the "well-founded fear" standard for asylum; thus, if an applicant is unable to meet the "well-founded fear" standard, he necessarily is unable to qualify for withholding of removal. *Al Najjar*, 257 F.3d at 1292-93.

As an initial matter, the petitioners' appellate brief fails to present any argument regarding the BIA's denial of their claims for CAT relief. Thus, the petitioners have abandoned any such argument, and we do not address the BIA's denial of CAT relief. *See Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (holding that a petitioner abandons an issue if he fails to offer argument on it).

With respect to Cabrera-Noriega's application for asylum, the BIA correctly

10

determined that Cabrera-Noriega failed to establish a nexus between the alleged persecution and his political opinion. *See Sanchez Jimenez*, 492 F.3d at 1232; INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). Cabrera-Noriega testified that he had participated in conservative party politics by campaigning for his uncle and for Gomez. However, there was no indication that the guerillas targeted Cabrera-Noriega based on his involvement in these campaigns. Cabrera-Noriega also testified that he was involved in the "Junior Chamber," but he acknowledged that this non-profit organization had no political affiliation. Cabrera-Noriega asserts that the ELN targeted him based on his involvement in Free Country, which was committed to helping kidnaping victims. However, Cabrera-Noriega testified that it was the Red Cross that contacted him and asked him to serve as a mediator, not the ELN. Moreover, no persecution occurred during the first ten meetings Cabrera-Noriega had with the ELN. It was during the eleventh meeting, after Cabrera-Noriega had failed to secure an acceptable ransom payment, that Cabrera-Noriega was detained and the alleged persecution commenced. Thus, the persecution was caused by Cabrera-Noriega's failure to secure the $2 million ransom, rather than his political beliefs. *See Sanchez v. U.S. Att'y Gen.*, 392 F.3d 434, 438 (11th Cir. 2004) (holding that "[i]t is not enough to show that [the petitioner] was or will be persecuted . . . due to h[is] refusal to cooperate with the guerillas"). This finding is supported by Cabrera-Noriega's testimony that he was

11

released under the condition that he would secure the $2 million payment from Taylor's family and that the ELN expected the money within two weeks or he would be killed. Cabrera-Noriega's testimony that the ELN called him an "oligarch" does not establish that the persecution occurred on account of a protected ground because he explained that an "oligarch" referred to an individual with a better social status and a better life, rather than someone with a particular political opinion. Accordingly, Cabrera-Noriega failed to establish that any persecution he suffered occurred on account of a protected ground.

Cabrera-Noriega's claim based on a well-founded fear of future persecution also fails because there was no evidence that any future persecution would be caused by Cabrera-Noriega's political opinions. *See Sanchez Jimenez*, 492 F.3d at 1232; INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). All of the persecution that Cabrera-Noriega suffered while in Colombia arose out of his failure to obtain the $2 million ransom from Taylor's family. Although Cabrera-Noriega testified that he was involved in conservative party politics and Free Country, he did not offer any evidence showing that he was persecuted by individuals other than those involved in the Taylor kidnaping. Furthermore, there was no evidence that the ELN would continue to look for Cabrera-Noriega nine years after he left the country. Accordingly, because Cabrera-Noriega failed to show that he suffered past persecution on account of a protected ground, or that he had a well-founded

12

fear of being persecuted based on a protected ground, the district court correctly denied Cabrera-Noriega's application for asylum. Furthermore, because Botero asserted that the threats she received were based on Cabrera-Noriega's problems with Taylor's kidnapers, the district court also correctly denied her claim for asylum. Because Cabrera-Noriega and Botero failed to meet the higher standard of proof required to establish eligibility for asylum, they also necessarily failed to show eligibility for withholding of removal. *See Al Najjar*, 257 F.3d at 1292-93. Accordingly, we deny the petition for review.

**PETITION DENIED.**