[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-13504
Non-Argument Calendar
_____

Agency No. A079-489-156


ALEKSANDR SERGEYEVICH NESTERENKO,
YULIYA YURYEVNA NESTERENKO,
MARIYA ALEKSANDROVNA NESTERENKO,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(May 7, 2013)

Before CARNES, MARTIN, and FAY, Circuit Judges.

PER CURIAM:

Lead petitioner Aleksandr Sergeyevich Nesterenko, along with his wife Yulia and their minor daughter Mariya, seeks review of the Board of Immigration Appeals' affirmance of the Immigration Judge's denial of his application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture (CAT). See 8 U.S.C. § 1158(a); 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 208.16(c). The petitioners contend that the IJ's adverse credibility determination, which the BIA adopted, is not supported by substantial evidence and that Aleksandr's testimony was therefore sufficient to establish past persecution in his native country of Russia on account of his Baptist faith, as required to warrant the grant of asylum and withholding of removal. The petitioners alternatively maintain that the BIA erred in failing to grant such relief based on a well-founded fear of future persecution, which they argue Aleksandr established through record evidence documenting discrimination, harassment, and violence against minority religious groups in Russia.[1]

## I.

The petitioners, natives and citizens of Russia, entered the United States on July 10, 2000, as nonimmigrant visitors with authorization to remain in the country until January 9, 2001. The petitioners stayed in the United States past the

---

[1] The petitioners do not specifically address or challenge the denial of their request for CAT relief, and have therefore abandoned the issue. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005).

authorized time period and later conceded removability.  With the aid of a Russian interpreter, Aleksandr applied for asylum, withholding of removal, and CAT relief, including his wife and minor daughter as derivative beneficiaries.  Aleksandr claimed that, on account of his evangelical Baptist faith, he suffered past persecution and had a well-founded fear of future persecution in Russia, particularly at the hands of the Russian National Unity Party (RNU), a neo-fascist paramilitary organization committed to maintaining both ethnic purity and strict adherence to Russian Orthodox Christianity.

Aleksandr based his claim for relief on seven discrete incidents of past mistreatment in Russia, two of which he neglected to disclose in his asylum application, credible fear interview, or both.  His accounts of several of these incidents were marked by varying degrees of apparent inconsistencies.  Aleksandr identified the following instances of abuse: (1) a February 1993 incident where he and other members of his Baptist congregation were beaten by RNU members for distributing religious materials in a public square, and then detained by the local police for three days for illegally distributing such materials; (2) a January 1994 incident in which RNU members vandalized and ransacked his business; (3) a 1997 incident in which he and his driver were stopped by RNU members and viciously beaten with sticks; (4) an incident in 1997 or 1998 where he was stopped by a police officer, falsely accused of drug possession, and detained for several

3

hours; (5) a February 1999 incident in which RNU members grabbed Mariya, then seven months old, and repeatedly tossed her into the air while threatening to drop her onto the pavement; (6) a 2000 incident in which RNU members set his church ablaze and assaulted the parishioners as they evacuated the burning building; and (7) the disappearance of his pastor shortly after the arson attack.

Aleksandr also maintained that, from February 1993 onward, he sporadically received threatening telephone calls and fliers from unknown persons, who he believed were affiliated with the RNU, which demanded that he either convert to Russian Orthodox Christianity, the dominant faith in the country, or renounce his Baptist religion altogether.  His mother continued to receive threatening phone calls even after Aleksandr and his family left for the United States, and in 2001 her mailbox was set on fire and "Death to sectarians" and a swastika were spray painted on her apartment door.

In support of their asylum application, the petitioners submitted various governmental reports and news articles, which generally confirmed that members of minority religious groups in Russia, including Baptists and other evangelical Christians, were subject to discrimination, harassment, and occasional physical attacks, particularly by skinheads, nationalists, and right-wing extremists.  The U.S. State Department's 2007 reports on human rights practices and religious freedom in Russia noted incidents of harassment and violence directed at religious

minorities, including cases of vandalism and arson attacks on non-Orthodox Christian churches. The State Department's 2005 report on religious freedom documented similar hostility, harassment, and instances of religiously motivated violence directed at evangelical Christians and other non-Orthodox religious groups. The report specifically mentioned incidents of vandalism, bombings, and arson attacks on Baptist and Pentecostal churches located in disparate regions throughout the country. Additional reports and new articles ranging from 2001 through 2005 documented church burnings and physical attacks on members of Protestant denominations, which were rarely investigated by the police and seldom led to the arrest of suspects.

The IJ initially granted the petitioners' request for asylum, concluding that Aleksandr credibly testified about the mistreatment he suffered in Russia, that the discrepancies between his hearing testimony and earlier statements were not significant enough to undermine his credibility, and that the cumulative impact of the identified incidents of abuse amounted to past persecution on account of his religious faith, even though none of the incidents individually reached that level. The BIA, on the government's appeal, found the credibility determination inadequate because the IJ failed to explain why the inconsistencies did not significantly undermine Aleksandr's credibility, and failed to make an express determination as to whether any of the inconsistencies were "key" to Aleksandr's

5

asylum claim.  The BIA accordingly remanded the case for a new credibility determination.

On remand, the IJ made individual credibility determinations with respect to each of the alleged incidents of past mistreatment, and then rendered an overarching adverse credibility finding based on the combined effect of numerous purported inconsistencies between Aleksandr's hearing testimony, asylum application, and responses at his credible fear interview.  While the IJ found that Aleksandr consistently and credibly testified about his Baptist faith, the beating and three-day detention he experienced in February 1993, and the threatening communications he received thereafter, the IJ rejected the remaining portions of his testimony as not credible.  The IJ expressly relied on perceived discrepancies concerning the ownership and merchandise distributed by the allegedly ransacked business, the date on which Aleksandr and his driver were attacked by RNU members, the date and length of time the police detained him for allegedly possessing drugs, and whether he was physically present during the alleged church burning.  The IJ also identified several apparent inconsistencies in Aleksandr's account of the 1999 incident involving his infant daughter, including his description of the uniforms worn by the RNU members, whether his daughter was snatched from his hands or a stroller, whether the RNU members physically assaulted his family, and whether his wife was present at the time.  The IJ

6

emphasized that Aleksandr failed to mention the alleged church burning in his asylum application, and failed to disclose the alleged disappearance of his pastor in either his application or credible fear interview.  Based solely on the adverse credibility determination, the IJ concluded that Aleksandr failed to carry his burden of demonstrating his eligibility for asylum, withholding of removal, or CAT relief.

The BIA expressly adopted and affirmed the IJ's decision, and highlighted several of the discrepancies cited by the IJ in support of the adverse credibility determination.  The BIA concluded that Aleksandr's lack of credibility on critical aspects of his claim was dispositive on the issue of whether he had established eligibility for asylum, withholding of removal, and CAT relief, and that there was no need to further address whether he suffered past persecution or had a well-founded fear of future persecution upon his return to Russia.

## II.

Where, as here, the BIA issues its own decision, but expressly adopts the IJ's opinion or reasoning, we review both the BIA's and IJ's decisions.  Xia v. U.S. Att'y Gen., 608 F.3d 1233, 1239 (11th Cir. 2010).  Administrative factual findings, including credibility determinations, are reviewed under the highly deferential substantial evidence test, which requires us to affirm the agency's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole."  Mohammed v. U.S. Att'y Gen., 547 F.3d 1340, 1344

(11th Cir. 2008) (quotation marks omitted).  We may reverse a factual finding or credibility determination only when the record compels reversal; the fact that the record may support a contrary conclusion is not enough.  Id. at 1345.

An asylum applicant must, with specific and credible evidence, establish either past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.  Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286–87 (11th Cir. 2005).  A sufficient showing of past persecution gives rise to a rebuttable presumption of a well-founded fear of future persecution.  8 C.F.R. § 208.13(b)(1).  However, even in the absence of past persecution, an applicant may still be entitled to relief if he can demonstrate a well-founded fear of persecution by showing either "a reasonable possibility [that he] would be singled out individually for persecution," or that he is a member of a group that is subject to a "pattern or practice" of persecution in his native country.  8 C.F.R. § 208.13(b)(2)(iii).  To qualify for withholding of removal, an alien must satisfy the more stringent standard of demonstrating that it is "more likely than not that [he] will be persecuted or tortured" upon being returned to his country.  Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1232 (11th Cir. 2005).

An adverse credibility determination must be supported by "specific, cogent reasons," and indications of reliable testimony include "consistency on direct

examination, consistency with the written application, and the absence of embellishments." Li Shan Chen v. U.S. Att'y Gen., 672 F.3d 961, 964 (11th Cir. 2011) (quotation marks omitted).[2] Once an adverse credibility determination is made, the burden is on the applicant to show that it "was not supported by specific, cogent reasons or was not based on substantial evidence." Shkambi v. U.S. Att'y Gen., 584 F.3d 1041, 1049 (11th Cir. 2009) (quotation marks omitted). An adverse credibility determination alone may be sufficient to support the denial of asylum or withholding of removal, but only if the applicant produces no evidence other than his testimony. Li Shan Chen, 672 F.3d at 964; Forgue, 401 F.3d at 1287. If an applicant "produces other evidence of persecution, whatever form it may take, the IJ must consider that evidence, and it is not sufficient for the IJ to rely solely on an adverse credibility determination in those instances." Forgue, 401 F.3d at 1287.

The petitioners contend that the omissions and inconsistencies identified by the IJ in support of his adverse credibility determination are either immaterial, the result of poor communication or translation, or are not inconsistencies at all. We agree with their assessment, but only to a limited extent that does not compel

---

[2] Because the petitioners' asylum application was filed before May 11, 2005, their claims for immigration relief are not governed by the REAL ID Act of 2005, which provides that an adverse credibility determination may be based on inconsistencies regardless of whether they go "to the heart of the applicant's claim." See 8 U.S.C. § 1158(b)(1)(B)(iii); Shkambi v. U.S. Att'y Gen., 584 F.3d 1041, 1049 n.7 (11th Cir. 2009). We have never decided in a published opinion whether adverse credibility determinations in pre-REAL ID Act cases must be based on inconsistencies that go to the heart of an applicant's claim, and we need not resolve that issue in this case because, as we explain later, a number of the inconsistencies identified by the IJ and the BIA directly relate to the petitioners' allegations of past persecution.

9

reversal of the adverse credibility determination.  Two of the purported

inconsistencies cited by the IJ are not supported by the record and, as such, are not

actual inconsistencies.  The IJ concluded that Aleksandr gave inconsistent

descriptions about the uniforms worn by the RNU members during the 1999

incident involving his daughter because he testified that the men were wearing

"winter camouflage clothes," but stated in his credible fear interview that they

wore "black uniforms."  During his hearing testimony, however, Aleksandr

promptly clarified that the RNU members wore dark security guard uniforms

adorned with swastikas, which was consistent with his earlier statements.  The

purported inconsistency stemmed entirely from the IJ's view that winter

camouflage referred to white-colored clothing.  But given Aleksandr's prompt

explanation about what he meant by winter camouflage and his otherwise

consistent statements that the RNU members wore dark uniforms, the IJ's

interpretation of the phrase "winter camouflage clothing" was unreasonable and

based solely on speculation or conjecture.  See Tang v. U.S. Att'y Gen., 578 F.3d

1270, 1278 (11th Cir. 2009) (noting that an adverse credibility determination must

rest on more than speculation, conjecture, or personal perceptions).

Similarly, the IJ found that Aleksandr's hearing testimony failed to mention

the presence of his wife during this incident, which purportedly conflicted with his

asylum application.  Although Aleksandr did not specifically refer to his wife

10

during his testimony on direct examination, he noted that RNU members threatened to "kill our kids" and "scolded us" for subscribing to a minority religious creed, and he later mentioned on cross-examination that his wife was pushing their daughter in a stroller when the RNU members first approached them. The record, therefore, does not support the IJ's determination that Aleksandr's hearing testimony and asylum application offered inconsistent accounts about whether his wife was present during the particular incident.

Two other discrepancies cited by the IJ are supported by the record, but are not material enough, when viewed in isolation, to constitute a reasonable or cogent basis for discrediting Aleksandr's testimony. See Todorovic v. U.S. Att'y Gen., 621 F.3d 1318, 1326 (11th Cir. 2010) (explaining that an inconsistency may constitute substantial evidence to support an adverse credibility determination where it is "inconsistent enough or material enough that rejecting the applicant's entire account would be a 'reasonable' decision for an IJ to make"). The IJ wholly rejected Aleksandr's account of the 1997 incident in which he was viciously beaten by RNU members based solely on a discrepancy about whether the attack occurred in August of that year, as indicated in Aleksandr's hearing testimony, or June of that year, as indicated during his credible fear interview. At each stage of the proceedings, however, Aleksandr gave otherwise consistent accounts of the attack, and he explained at the merits hearing that he could not recall the exact dates of

11

events that occurred more than eight years earlier.  Under the circumstances, a minor discrepancy concerning the precise month in which the incident took place does not provide a reasonable basis for discounting Aleksandr's testimony about the entire episode as not credible.  Likewise, the IJ pointed to an inconsistency about whether Aleksandr's daughter was snatched from his hands, as indicated in his asylum application, or a stroller, as suggested in his hearing testimony.  The distinction between "hands" and a "stroller" does not constitute a material inconsistency in Aleksandr's account of the incident, particularly given that Aleksandr's asylum application was translated into English by a Russian interpreter and the English term "hands," when used in conjunction with the act of snatching or grabbing, is often employed in a metaphorical sense.

Nevertheless, the BIA and the IJ identified a number of actual inconsistencies that, either individually or collectively, were significant enough to constitute specific, cogent reasons to support their adverse credibility determination.  See Shkambi, 584 F.3d at 1049.  The IJ and the BIA accurately noted that Aleksandr provided conflicting statements regarding the date and length of time that the police allegedly detained him.  His asylum application indicated that he was detained for "a whole day" and released "after 24 hours," while he later testified that his detention lasted approximately three or four hours.  He also asserted at various times, including on cross-examination, that the incident

12

occurred in 1997, while his testimony on direct examination indicated that it happened in 1998. There was also a discrepancy with regard to whether he and his wife were physically assaulted during the 1999 incident involving his infant daughter. Although Aleksandr stated in his credible fear interview that the RNU members "hit [his] family," he did not mention any physical abuse in his asylum application or hearing testimony.

Furthermore, Aleksandr offered inconsistent, or at least confusing, accounts about the nature and ownership of the business that was allegedly ransacked by RNU members. During the merits hearing, Aleksandr testified that he opened the business with other members of his congregation, and that it sold food and clothing and distributed religious materials on behalf of their church. In his earlier statements, however, Aleksandr made no mention of the fact that he opened the business with fellow church members or that the company distributed religious materials, and he inconsistently described the business as selling automotive parts instead of food and clothing. He also suggested during his credible fear interview that he was physically present during the alleged arson attack on his church in 2000, stating that RNU members "lit us on fire" and started to "beat us" after "[w]e broke the windows [of the church] to escape," though he later testified that he did not arrive at the church until after the relevant events took place. As the IJ noted, he also failed to disclose the alleged church burning in his asylum application, and

13

failed to mention the alleged disappearance of his congregation's pastor in either the application or his credible fear interview.

Aleksandr offered explanations for some these discrepancies before the BIA, which he now reiterates, asserting that: (1) he used the phrase "a whole day" in a figurative sense when recounting his detention, which his Russian interpreter mistakenly interpreted to mean a 24-hour period; (2) he used the terms "we" and us" when describing the arson attack in his credible fear interview to broadly refer to his "religious brethren"; and (3) it was unlikely that the asylum officer would have asked about the alleged disappearance of his pastor during the credible fear interview when he did not disclose the incident in his asylum application. While these explanations might be plausible, they do not account for all of the material discrepancies cited by the IJ. Nor do they otherwise compel reversal of the adverse credibility determination. See Chen v. U.S. Att'y Gen., 463 F.3d 1228, 1223 (11th Cir. 2006) (concluding that, although an asylum applicant offered tenable explanations for inconsistencies, those explanations would not compel a reasonable fact finder to reverse the IJ's adverse credibility determination).

The cumulative impact of several of the inconsistencies cited by the BIA and IJ, which are both supported by the record and relate to critical aspects of Aleksandr's claimed mistreatment in Russia, adequately supports the adverse credibility determination. In turn, the record does not compel the conclusion that

14

the petitioners have met their burden of establishing past persecution in Russia.[3]

Although the governmental reports and news articles submitted by the petitioners indicate that religious minorities are subject to discrimination, harassment, and occasional acts of violence in Russia, that evidence did not corroborate the individual incidents of mistreatment that Aleksandr claimed to have suffered.

However, the adverse credibility determination was not by itself sufficient to dispose of the petitioners' claims for asylum or withholding of removal. Even in the absence of past persecution, an applicant may be entitled to asylum if he possesses a well-founded fear of future persecution, which can be satisfied by showing membership in a group subject to a pattern or practice of persecution, or he may eligible for withholding of removal if it is more likely than not that he will suffer such persecution. See 8 C.F.R. §§ 208.13(b)(2)(iii), 208.16(b)(2). At the very least, the governmental reports and news articles submitted by the petitioners suggest that members of non-Russian-Orthodox religious groups, including Baptists, may be subject to mistreatment amounting to persecution. The BIA's and IJ's adverse credibility finding did not relieve them of their duty to meaningfully consider this documentary evidence and make adequate findings about the likelihood of future persecution on account of Aleksandr's unquestioned religious

_____

[3] The petitioners do not argue that the past incidents of abuse credited by the IJ, including the threatening communications and the battery and three-day detention Aleksandr experienced in 1993, are enough to amount to past persecution. As such, they have abandoned any challenge based solely on these events to the BIA's and IJ's finding of a lack of past persecution. See Sepulveda, 401 F.3d at 1228 n.2.

faith.  See Forgue, 401 F.3d at 1287; Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1375 (11th Cir. 2006) (noting that the BIA and IJ must give "reasoned consideration" to an alien's application and make "adequate findings").

Although the IJ generally referred to the documentary materials the petitioners submitted, neither he nor the BIA considered whether those materials were sufficient to show that Aleksandr has a well-founded fear of future persecution, or is likely to suffer such persecution, on account of his religion if returned to Russia, particularly in light of the specific incidents of past mistreatment that they found credible.  Because the BIA and IJ did not adequately consider whether the petitioners are eligible for asylum or withholding of removal based on the likelihood of future persecution, we grant the Nesterenkos' petition for review, vacate the BIA's decision, and remand to the BIA for the limited purpose of allowing it to make these determinations in the first instance.  See Sanchez Jimenez v. U.S. Att'y Gen., 492 F.3d 1223, 1236 (11th Cir. 2007) ("[W]hen the IJ or BIA has not made findings of fact or has not applied the law to those facts, appellate courts should remand to the allow the IJ to make such determinations in the first instance.").

**PETITION GRANTED; VACATED AND REMANDED.**