[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13849

_____

Agency No. A208-919-884

ABDIRAHMAN SALAD WARSAME,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(January 14, 2020)

Before JORDAN, GRANT, and SILER,* Circuit Judges.

JORDAN, Circuit Judge:

Abdirahman Salad Warsame seeks review of a final order by the Board of

_____

* The Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by
designation.

Immigration Appeals affirming the denial of his application for asylum and withholding of removal. Mr. Warsame asserts that the immigration judge and the BIA erred by (1) holding that he had not suffered past persecution at the hands of the terrorist organization al-Shabaab; (2) finding that he had not shown that political opinion was a central reason for his persecution; (3) failing to consider whether he was persecuted as a result of his membership in a particular social group—his family; (4) concluding that he could reasonably be expected to relocate within Somalia; and (5) denying him due process during the hearing before the IJ. Because we conclude that the BIA did not consider some of Mr. Warsame's claims, we vacate and remand for further proceedings, while dismissing the unexhausted due process claims.

**I**

**A**

Mr. Warsame is a native of Somalia. On January 7, 2016, he arrived in the United States and was detained. On January 29, 2016, during a credible fear interview with an asylum officer, Mr. Warsame explained that al-Shabaab killed his daughter and sister in a bombing in Somalia that was directed at his father for his work as a police chief for the Somali government. Following the bombing, al-Shabaab called Mr. Warsame and threatened to kill him, in part, because of his father.

2

Mr. Warsame then explained that he left Somalia to study in Turkey and Malaysia and that, upon his return, al-Shabaab renewed their death threats because of his work as a teacher.  [When the asylum officer asked whether he thought that al-Shabaab believed he was opposed to them, he replied: "I believe so [because] every time I did a seminar that is when they would contact me, so I would assume so." He stated that al-Shabaab killed other teachers at his college for using western forms of education.  He also explained that al-Shabaab killed his brother-in-law because he was "helping [Mr. Warsame's] father."

When the asylum officer asked if he had ever been threatened or harmed on account of his political opinion or opposition to political activity, Mr. Warsame answered that he "didn't have any particular opinions or political beliefs that [he] was attacked for personally, but [he] was attacked for [his] father's position." When the asylum officer inquired as to what Mr. Warsame believed was the "main reason that [al-Shabaab] would still want to kill you if you go back," he gave two reasons: "One is related to my father and the other is the education that they told me to stop."

Nearly one month later, Mr. Warsame appeared before the IJ and stated that he was "afraid of returning to Somalia because of the political affiliation of" his father and because he was a teacher and "there is a group in Somalia that attack[s] the teachers[.]"  The IJ provided Mr. Warsame with an I-589  asylum application.

In his application, Mr. Warsame stated that he feared persecution because al-

3

Shabaab "does not want Somali people to be educated and as a teacher . . . they felt I was educating and liberating the people through Western education so if I return I would be killed." He explained that he was afraid of being killed because he was "educating my people in Somalia not to follow or believe in wrong religious[ ] beliefs of [al-Shabaab] and that they should be educated so that they can make better decisions that would help them in life." He also described how al-Shabaab killed his sister and daughter, and his fear that he would also be killed like his family members and colleagues.

In a contemporaneous declaration, Mr. Warsame elaborated on his experiences with al-Shabaab in Somalia. He explained that his father was appointed as a police chief under the transitional federal government and became a target because "[al-Shabaab was] targeting everyone against them, specially [sic] their families[,] so" his father took his family to a safehouse. Al-Shabaab bombed that safehouse on June 30, 2007. Mr. Warsame survived uninjured, but his daughter and sister were killed, and his father was seriously injured. His father was initially unable to obtain medical treatment because of his clan membership. His father was eventually taken out of the country for treatment but, after he returned, Mr. Warsame's mother insisted they leave the city to escape al-Shabaab. Because Mr. Warsame belongs to a minority clan in Somalia, his father-in-law (a member of a larger, more powerful clan) gave him money and urged him to leave the country to

4

obtain an education and for his safety.

In 2014, Mr. Warsame returned to Somalia to conduct a survey in connection with his post-graduate studies in Turkey. While in Somalia, he received death threats from al-Shabaab. They later kidnapped and tortured him, burning his genitals. They released him only after his mother's friend—an elder from a different clan—interceded on his behalf. He returned to Turkey to finish his studies, after which he was obligated to return to Somalia in 2015.

Al-Shabaab later opened gunfire at the university in Somalia where Mr. Warsame was teaching, killing his best friend. Mr. Warsame survived by chance. In his declaration, Mr. Warsame explained that there was nowhere in Somalia he could live because his clan membership precluded him from moving safely to other regions within the country. On May 30, 2015, Mr. Warsame left Somalia. He later learned that al-Shabaab killed his brother-in-law for helping Mr. Warsame's father in October 2015.

At the end of his declaration, Mr. Warsame included a section entitled "The Reason Why I Am Seeking Asylum . . . ." He explained that he was seeking asylum because he is a "professional lecture [sic], trainer, and . . . gave seminar to provide education[.]" He stated that he could not continue to teach, as al-Shabaab opposes western and formal forms of education. He went on to say that al-Shabaab's extremism "energized" him to continue teaching and "disseminate vital information

to the students and private sectors" to "liberate[ ] them from the erroneous belief of [al-Shabaab]." He stated that he had condemned al-Shabaab in public speeches. He listed, among the risks he would face if forced to return to Somalia, renewed persecution and abuse as a result of his membership in clan shancaleemod, or death at the hands of al-Shabaab related to his father's work as a police chief or his own position as an educator. Finally, he explained that he was "actually fleeing from persecution on account of his political opinion and membership in a social group."

In addition to his declaration, Mr. Warsame submitted various articles and reports from non-governmental organizations recounting the ongoing violence in Somalia brought about by al-Shabaab, as well as the danger caused by inter-clan fighting and abuse. Of note, he provided a U.S. State Department travel warning dated May 24, 2016. That warning noted, among other things, that "al-Shabaab has demonstrated the capability to carry out attacks in government-controlled territories," and that "[i]nter-clan and [i]nter-factional fighting [could] flare up with little or no warning."

He also submitted the British Home Office's Country Information and Guidance report on Somalia, which noted that "[p]olitical violence in Somalia is dominated by the activity of Al Shabaab and its conflict with the Federal Government and allied forces." That British report noted that al-Shabaab was involved in more than 20% of all conflict events in Somalia in 2013, and over 30%

6

of all reported fatalities, "making it the single most active non-state force."  And it pointed out that "[t]he group's declining capacity and control over territory is evident in the data, however, as this rate represents a decline from over 26% of activity attributed to the group in the preceding two years."  Related to government-led efforts to recapture land from al-Shabaab, the British report explained that "any improvement is limited to specific towns which the government—with heavy reliance on AMISOM or aligned forces—hold.  Their control and influence is weak . . . [meaning] that . . . they provide very limited protection and security for civilians."[1]  It went on: "Though the government continues to hold key towns, their reliance on AMISOM and Ethiopian forces means that the gains are extremely fragile, and can neither be considered substantial, fundamental, durable or sustainable."

At his asylum hearing before the IJ, Mr. Warsame—appearing *pro se*—recounted the same details described in his declaration.  He stated that he was fleeing from al-Shabaab and, when asked what al-Shabaab "did to [him]," he said "[f]irst of all, they have attacked my father and the family after that because my father was a policeman."  He also discussed his 2014 kidnapping and torture.  He explained that his kidnapping was due to al-Shabaab's "following" his father and that the 2014 incident was "the first time they" saw him back in Somalia.

---

[1] AMISOM is the African Union Mission in Somalia, which acts as a peacekeeping force.

7

During a colloquy with Mr. Warsame, the IJ explained: "I am afraid that an event against your father by criminals in 2007 does not give you asylum in 2017. And since al-Shabab is not in control of many areas of Somalia because of the joint efforts of the international community, then there are places for you to relocate."

In response, Mr. Warsame said:

> The problem why I'm here, Your Honor, is not because of my father only. I know what al-Shabab has done to my father, but I have been victimized by these people because I was a teacher. I was helping the country. And they knew that whoever is teaching people and helping people—

At that point, the IJ cut him off and said:

> Sir, you cannot have asylum in the United States. The government has done you no harm and your government is trying very hard to get control of the country . . . . You have a brand new president[.]
>
> * * *
>
> al-Shabab does not want to harm you because you are a teacher, they just don't want you teaching. And you weren't a teacher that long anyway. Sir, I believe you came to the United States because you want to be here. You have admitted to the Court that you knew you could not get a visa. So, you came the way you came. So, you have to return to your country, sir.

Mr. Warsame pointed out that the IJ had not asked him about the 20 articles that he submitted about violence in Somalia. The IJ responded that her decision was unrelated to his articles. Rather, the Somali government was "trying" to improve, and the IJ expected Mr. Warsame to relocate.

8

Mr. Warsame attempted to explain that he did not know where his family was, because they were constantly fleeing violence. The IJ was not persuaded: "Sir, you cannot have asylum in the United States under United States law." [2]

## B

In her decision, the IJ found Mr. Warsame to be credible "in spite of numerous inconsistencies or confusion." The IJ concluded, however, that the "harsh conditions" Mr. Warsame endured did not constitute past persecution. Though the IJ "would grant that being burned in a private area . . . is definitely unforgiveable and a dastardly deed," the act was not committed by a government actor. The "onetime event [ ] was done by a criminal element in Somalia." And the 2007 al-Shabaab bombing that killed his daughter and sister, and maimed his father, could not establish past persecution because "harm to others[,] even an applicant's family members[,] does not necessarily serve to establish persecution of the applicant personally."

Because the bombing occurred at a police station, it seemed to the IJ that "al-Shabab was targeting a person whose job was to stop them from their terrorist activities." Moreover, "general conditions of strife and anarchy are not necessarily past persecution." The IJ denied the asylum application because Mr. Warsame could safely relocate within Somalia, had shown neither a past persecution nor a well-

---

[2] The government did not cross-examine Mr. Warsame during the hearing.

founded fear of future persecution, making him ineligible for asylum.

The IJ also found that Mr. Warsame had not established a nexus between the persecution he fears and any statutorily protected ground. The IJ, unable to discern to which social group Mr. Warsame claimed membership, *sua sponte* ruled that he was "more likely than not . . . claiming a social group of persons with Master's degrees who return to Somalia to teach and whom al-Shaba[a]b targets, because al-Shaba[a]b does not want them teaching the subjects they are teaching." Having defined the social group in this way, the IJ then concluded that "this social group does not have sufficiently well[-]defined boundaries to narrow it to a group with a recognized level of social visibility sufficient to allow members of society to readily identify or perceive those as members of that particular social group."

Turning to political opinion, the IJ first described Mr. Warsame's claim as an inability to return to Somalia "because of . . . an imputed political opinion based on the bombing of the police station and the harm to his father in 2007." She concluded that Mr. Warsame had "fatally failed to express a political opinion that . . . someone the government" could not or would not control "is motivated to harm the respondent based on that political opinion that they know of and disagree with."

In the IJ's view, there was "no indication that [Mr. Warsame] was singled out by al-Shaba[a]b on account of his moral or political opposition to terrorist activity. Instead, [he] was harmed because al-Shaba[a]b wanted him to stop teaching."

10

Because Mr. Warsame was a victim of "societal violence, terrorism, and revenge rather than" persecution based on political opinion, his application could not succeed.

Furthermore, the IJ rejected the 2007 bombing as a basis for a past persecution finding because of Mr. Warsame's "attempt to claim the harm to his father must in some way be tied to him personally, meaning that the harm to his father in the bombing of the police station connects with al-Shaba[a]b not wanting him to teach imputes the harm to his father with the objective to attack or harm him." "This," the IJ explained, "he is not able to accomplish."

For many of the same reasons that the IJ concluded Mr. Warsame could not show a nexus to his past persecution, she also determined that he could not show a well-founded fear of future persecution. And she concluded that Mr. Warsame could relocate to Somalia based on the government's efforts to curtail violence in the country.

## C

In his notice of appeal to the BIA, Mr. Warsame stated that the IJ erred in concluding that he had failed to establish a likelihood of persecution upon return based on his membership in a particular social group. He also asserted that the IJ erred in not letting him fully present his case at the hearing, denying him due process.

The BIA affirmed the IJ's decision in a two-page orderQuoting Mr.

Warsame's brief on appeal, the BIA defined his proposed social group as "Somali teachers who teach the Western Education [and] are targeted by [a]l-Shabaab." According to the BIA, this did not satisfy the requirements of a protected social group because Mr. Warsame "did not establish that al-Shabaab members targeted him to punish him because he is a teacher[;] rather the defining attribute of [his] proposed particular social group is persecution by al-Shabaab for teaching 'Western Education' and the defining attribute of a particular social group cannot be persecution."  Furthermore, the proposed social group lacked any "immutable characteristic" because Mr. Warsame had not demonstrated that his occupation was "fundamental to his identity."

The BIA also concluded that the IJ did not clearly err in deciding that Mr. Warsame's injuries were not connected to any implied political opinion, but rather to his relationship with his father.  It also agreed, without analysis, that Mr. Warsame could safely relocate to Somalia and avoid al-Shabaab.

## II

We review the BIA's decision alone, "except to the extent that it expressly adopts the IJ's opinion." *Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001). In such cases, we review the IJ's decision and analysis, as well. *See id.* Because the BIA here expressly agreed with several of the IJ's findings, we review the relevant portions of her decision.

12

We review the BIA's legal conclusions *de novo*. *See Mohammed v. Ashcroft*, 261 F.3d 1244, 1247 (11th Cir. 2001). We review factual determinations about statutory eligibility for asylum or withholding under the substantial evidence test. *See Perlera-Escobar v. Exec. Office for Immigration*, 894 F.2d 1292, 1296 (11th Cir. 1990). These findings of fact "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Stated differently, we will affirm the BIA's findings of fact if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *D-Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 818 (11th Cir. 2004) (internal quotation marks and citation omitted). Accordingly, we will not reverse the BIA's decision just because the record might support a contrary conclusion. *See Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004).

It is not our prerogative to re-weigh the evidence at this stage. *See id.* Nor may we "find, or consider, facts not raised in the administrative forum[.]" *Id.* Credibility determinations similarly benefit from this very deferential standard of review. *See D-Muhumed*, 388 F.3d at 818.

## III

Asylum applications are governed by 8 U.S.C. § 1158. Any alien who is physically present in the United States may apply for asylum, regardless of his or her immigration status. *See* § 1158(a)(1). The "Attorney General may grant asylum

13

to an alien who has applied for asylum in accordance with the requirements and procedures established . . . if . . . the Attorney General determines that such alien is a refugee" as defined by statute. *See* § 1158(b)(1)(A).

The term "refugee," in turn, is defined as

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]

8 U.S.C. § 1101(a)(42).

"To establish asylum eligibility, the petitioner must, with specific and credible evidence, demonstrate (1) past persecution on account of a statutorily listed factor, or (2) a well-founded fear that the statutorily listed factor will cause future persecution." *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1257 (11th Cir. 2006) (internal quotation marks omitted) (quoting 8 C.F.R. § 208.13). A showing of past persecution creates a rebuttable presumption that the petitioner has a well-founded fear of future persecution. *See* 8 C.F.R. § 208.13. In the absence of such a showing, the petitioner must "demonstrate a well-founded fear of future persecution that is both subjectively genuine and objectively reasonable." *Ruiz*, 440 F.3d at 1257.

An applicant may also establish withholding of removal by showing that his "life or freedom would be threatened in that country because of [his] race, religion,

14

nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). The burden of proof for such a claim is "more likely than not," and therefore more stringent than the standard for asylum relief. *See Ruiz*, 440 F.3d at 1257.

On appeal, Mr. Warsame challenges the BIA's determination that he had not established a nexus between any past persecution and a protected ground. He argues that al-Shabaab targeted him both because of his actual political opinion, and the political opinion imputed to him by al-Shabaab on account of his father's position as a police officer. Relatedly, he asserts that the same kinship tie forms the basis for a "particular social group." He also challenges the BIA's findings on the feasibility of relocation within Somalia and argues that he was denied due process during his asylum hearing.

The government asserts that Mr. Warsame did not properly exhaust his kinship ties and actual political opinion arguments. It further argues that kinship ties do not satisfy the particular social group definition, and that his proposed social group involving instructors teaching western education who are targeted by al-Shabaab is circular and does not constitute a protected ground. The government contends that Mr. Warsame did not suffer past persecution, nor is he likely to suffer future persecution, and that substantial evidence supports the BIA's conclusion that Mr. Warsame could safely relocate within Somalia. Finally, the government argues

15

that Mr. Warsame did not sufficiently exhaust his due process claims and that, even if he had, they should fail on the merits.

We begin our discussion by addressing exhaustion, and then turn to the merits of Mr. Warsame's past persecution, well-founded fear, and relocation arguments.

**A**

A petitioner's failure to exhaust all administrative remedies available deprives us of jurisdiction to review any unexhausted claims. *See Amaya-Artunduaga v. U.S. Att'y Gen.*, 463 F.3d 1247, 1250 (11th Cir. 2006); 8 U.S.C. § 1252(d)(1). "And when a petitioner has neglected to assert an error before the BIA that he later attempts to raise before us, the petitioner has failed to exhaust his administrative remedies." *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 800 (11th Cir. 2016).

To properly exhaust a claim, a petitioner must do more than "merely identif[y] an issue to" the BIA. *Id.* Instead, he must raise the "core issue," and "also set out any discrete arguments he relies on in support of that claim." *Id.* (internal quotation marks and citations omitted). A *pro se* petitioner is not expected to "use precise legal terminology or provide well-developed arguments to support his claim," but he must "provide information sufficient to enable the BIA to review and correct any errors below." *Id.* (internal quotation marks and citations omitted). An "unadorned, conclusory statement[ ]" will not suffice under this standard. *Id.* The ultimate question is whether the BIA has had a full opportunity to consider the claim and

16

develop the record necessary to enable judicial review. *See id.*

Where a petitioner appears *pro se*, we construe his pleadings liberally. *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998) (per curiam) ("*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed."). We have alluded to this liberal treatment of *pro se* filings in addressing exhaustion in the immigration context. *See Ali v. U.S. Att'y Gen.*, 931 F.3d 1327, 1331 n.2 (11th Cir. 2019) (citing *Tannenbaum*).

**1**

Mr. Warsame, we conclude, adequately exhausted his actual political opinion arguments.

In his declaration accompanying his asylum application, Mr. Warsame explicitly stated that he "fled Somalia to the United States owing to the fact that he was being persecuted on account of his political opinion and membership in a particular social group." R. at 680. In his I-589 form, he explained that al-Shabaab targeted him because he was "providing education and liberating the Somali people from wrong . . . beliefs propagated by [a]l-Shabaab . . ." and because he was "educating . . . people in Somalia not to follow or believe in wrong religio[u]s belief[]s of [a]l-Shabaab[.]" And his teaching went beyond purely debunking al-Shabaab's beliefs; he said that he had "vehemently condemned it in various public

17

speaking [events] to the youth, people [in] both formal and informal sectors back home in Somalia." R. at 674. He also stated that he planned seminars in opposition to al-Shabaab. *Id.* at 676. Further, he declared that he "was an executive member of the Somalia researcher development center that was endorsed as a political outfit by country policies." *Id.* at 666.

Indeed, the declaration makes clear that Mr. Warsame's political opinion was a crucial element his asylum application. For example, he declared that "[he] is a member[ ] of a particular social group and a political opinion who experienced past persecution for a reason of his political view and his family." *Id.* At the end of his declaration, he stated that "he fled Somalia to the United States owing to the fact that he was being persecuted on account of his political opinion and membership in a particular social group," and "[he] was actually fleeing from persecution on account of his political opinion and membership in a social group." *Id.* at 680–81.

The government asserts that, in his brief on appeal to the BIA, Mr. Warsame only mentioned his social group and imputed political opinion. *See* Gov't Br. at 22–23. Mr. Warsame expressly stated in his brief that "he was persecuted in the past by the member of [a]l-Shabaab in Somalia on account of his imputed anti-[a]l-Shabaab political opinion." R. at 15. But the sentence immediately following that one reads as follows: "[a]l-Shabaab threatened [Mr. Warsame] and his colleagues for teaching the secular education throughout Mogadishu and spreading the anti-[a]l-Shabaab

18

opinion through his teachings[.]" R. at 16. Furthermore, in his brief, Mr. Warsame described his work as an educator and followed that immediately with "[t]his sufficiently alleged that he was targeted by reason of imputed political opinion." *Id.* at 28. He went on to describe receiving threatening phone calls from al-Shabaab in response to seminars he conducted. *Id.* at 17, 29. He noted that:

> Al-Shabaab specifically referenced the Respondent's past refusal to stop the teaching of the western education when they telephonically threatened him, attempted to kill him, and threatened with death for his refusal to stop the teachings and the seminars. *Thus, the Respondent's refusal to stop the teaching and the seminars to the [a]l-Shabaab was an expression of his anti-[a]l-Shabaab political opinion.*

*Id.* at 32 (emphasis added).

Mr. Warsame explained in his brief to the BIA that he was "addressing people to get education and rebuild Somalia for a better future, also to discuss how [a]l-Shabaab is destroying the younger generations [sic] future and not educating them about the goodness of education. This sufficiently alleged that he was targeted by reason of imputed political opinion." *Id.* at 28. Though he used the term "imputed," we think Mr. Warsame's briefings show—fairly clearly—that he considered his teaching a political, as much as a professional, act.

We conclude that Mr. Warsame's repeated references to his activities, his political motivations for engaging in them, and al-Shabaab's hostile responses, are sufficient to have exhausted these claims before the BIA. Indeed, in her decision,

19

the IJ appeared to tacitly acknowledge the underlying political opinion argument, though her analysis was framed as addressing an implied/imputed political opinion claim. For example, in explaining why Mr. Warsame had failed to satisfy the nexus requirement, the IJ stated that "[he] also claims that he cannot return to his native country because of, it would appear to the Court, an imputed political opinion based on the bombing of the police station and the harm to his father in 2007." *Id.* at 240. But, two paragraphs later, she said that, "[t]here is no indication that the respondent was singled out by al-Shabab on account of his moral or political opposition to terrorist activity." *Id.* And, on the following page, she noted that the "evidence in the record indicates that [Mr. Warsame] was a victim of societal violence, terrorism, and revenge rather than that he was singled out by al-Shabab on account of his political opinion." *Id.* at 241.

The BIA expressly adopted the IJ's analysis:

> The Immigration Judge also properly found, without clear error, that the respondent was not harmed due to an implied political opinion but rather due to his relationship with his police officer father, and that the respondent could reasonably relocate within Somalia to avoid al-Shabaab[.]

R. at 3. Ostensibly, the BIA decided only the question of whether Mr. Warsame was targeted because of an imputed political opinion. But a close reading of the IJ's opinion suggests that she performed a more expansive analysis. As noted, we generally review only the BIA's decision, except to the extent the BIA has expressly

20

adopted the IJ's decision. *See Jeune*, 810 F.3d at 799. But "[w]hen the BIA explicitly agrees with the findings of the [IJ], we review the decision of both the BIA and [IJ] as to those issues." *Id.*

This somewhat confusing procedural posture leads us to exercise caution. The Supreme Court has made clear that "[a] court of appeals is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Gonzales v. Thomas*, 547 U.S. 183, 186 (2006) (per curiam) (internal quotation marks and citations omitted) (reversing appellate court which, after properly determining that the BIA had not adequately considered a kinship-ties-social-group claim, decided the merits of that issue rather than remanding to the BIA). Instead, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Id.* (internal quotation marks and citations omitted).

The government, at oral argument, urged us to remand the case for the BIA and the IJ to make the determination on actual political opinion in the first instance. We agree that this is the appropriate course. Indeed, it is the one mandated by the Supreme Court. *Cf. I.N.S. v. Orlando Ventura*, 537 U.S. 12, 16–17 (2002) (per curiam) (concluding that the court of appeals exceeded its legal authority in ruling on an alternative argument that the BIA had not addressed, although the IJ had considered it).

21

Here, as in *Ventura* and *Thomas*, "every consideration that classically supports the law's ordinary remand requirement does so here." *Ventura*, 537 U.S. at 17. "The agency can bring its expertise to bear upon the matter; it can evaluate the evidence; it can make an initial determination; and, in doing so, it can, through informed discussion and analysis, help a court later determine whether its decision exceeds the leeway that the law provides." *Id.*

**2**

We similarly conclude that Mr. Warsame exhausted his kinship-ties-as-a-social-group arguments, and that remand is appropriate as to this issue as well.

In his declaration filed with his asylum application, Mr. Warsame explained that he and his family members "suffered harm that arises to the level persecution [sic] and torture because of their membership of a particular social group[.]" R. at 666. He described having to move to a safe house at a police station because his father, a police officer, was actively working against al-Shabaab and al-Shabaab "are targeting everyone against them, [e]specially their families." *Id.* at 667. He described the attack on the police station, which killed his daughter and sister and severely injured his father. *Id.* at 668. He noted that his capture and torture in 2014—which took place before he began teaching—was "because of" his father. *Id.* at 670.

At his asylum hearing, Mr. Warsame reiterated that al-Shabaab attacked his

22

father and his family because his father was a police chief. *Id.* at 398. And, when the IJ asked him what al-Shabaab wanted from him in 2014 when they captured and tortured him, he stated that "they were following my father and this was the first time they seen [sic] me back." *Id.* at 402. He described earlier assassination attempts on his father, explaining that "al-Shabaab targets the person who works for the government and if they can't find him, they will target his family to harm him." *Id.* at 403–04.

In his brief on appeal to the BIA, Mr. Warsame explained that his daughter and sister were killed "[b]ecause [his] father was a chief police officer in year 2006–2007 and [a]l-Shabaab have been targeting members of the police and their families." *Id.* at 16. He described receiving death threats in connection with his teaching and being told that he would be killed like his daughter and sister. *Id.* at 17. He also stated that al-Shabaab killed his brother-in-law because he was "helping" Mr. Warsame's father in the refugee camp. *Id.* at 18. The BIA appeared to have recognized the connection between at least some of Mr. Warsame's injuries and his family when it held that the IJ "properly found . . . that the respondent was not harmed due to an implied political opinion but rather due to his relationship with his police officer father[.]" *Id.* at 3.

Mr. Warsame, in defining his social group membership, did borrow the IJ's *sua sponte* formulated definition. But we conclude that, based on the procedural

23

history set out above, Mr. Warsame "present[ed] enough to flag the issue [of his kinship ties] and enable the BIA to address the matter." *Bing Quan Lin v. U.S. Att'y Gen.*, 881 F.3d 860, 869 (11th Cir. 2018). Mr. Warsame has effectively and repeatedly argued the core of the issue he now appeals; that al-Shabaab targeted him and others in his family because of his father's work as a police officer. This is sufficient. *Cf. Montano Cisneros v. U.S. Att'y Gen.*, 514 F.3d 1224, 1228 n.3 (11th Cir. 2008) ("Petitioners have always argued the core issue now on appeal: their entitlement to reopening because [their attorney]'s behavior constituted ineffective assistance of counsel. Our review of the record demonstrates Petitioners' preserved arguments have provided us sufficient jurisdiction to decide this case.").

Mr. Warsame asserts that we should remand this issue to the BIA for a determination. *See* Mr. Warsame's Br. at 34. For the same reasons noted earlier, we agree. We also note that, after oral argument, the Attorney General issued *Matter of L-E-A*, 27 I. & N. Dec. 581 (A.G. 2019). In that case, the Attorney General concluded that "an alien's family-based group will not constitute a particular social group unless it has been shown to be socially distinct in the eyes of its society, not just those of its alleged persecutor." *Id.* at 582. Mr. Warsame, in a supplemental filing, asserts that his family was "known in society for its ties to the government and vocal opposition to al-Shabaab," and therefore satisfies this requirement. On remand, the BIA should review Mr. Warsame's social group claim considering the

24

Attorney General's recent opinion in *Matter of L-E-A*.

**3**

Based on the record before us, we conclude that Mr. Warsame did not adequately exhaust his due process claims.

Because the BIA does not have the power to decide constitutional claims—like the validity of a federal statute—some courts have suggested that certain due process claims need not be administratively exhausted. *See Amaya-Artunduaga*, 463 F.3d at 1251. But where the claim "is within the purview of the BIA which can provide a remedy, the exhaustion requirement applies with full force." *Bing Quan Lin*, 881 F.3d at 868 (citation omitted). We have previously held that a due process claim "regarding the fairness of the Immigration Judge as a neutral factfinder, [is] precisely the kind of procedural error which requires exhaustion." *Id.* (internal quotation marks and citation omitted).

Mr. Warsame's notice of appeal contained three brief statements regarding the IJ's conduct at the hearing and her decision:

> 4. IJ erred in denied [sic] the respondent application for [a]sylum, and withholding of removal and protection against torture without specific and [cogent] reasons.
>
> 5. IJ erred when she didn't hear my case at all and she didn't let me present my case.
>
> 6. IJ also erred in[ ] not allowing the Respondent the opportunity to explain himself during his removal proceed[ings] just rushed to her questions but she not

allow him to elaborate any answer which she violated his
Due Process.

R. at 225.

Nowhere, however, did Mr. Warsame develop these arguments. Nor did he explain how the IJ's actions prejudiced him. He did not point to any exchange in the record to support his claim, nor did he explain what process was due, or what legal standard applied. To make a due process claim, a petitioner "must show that he was deprived of liberty without due process of law . . . and that the asserted error caused him substantial prejudice." *Gonzalez-Oropeza v. U.S. Att'y Gen.*, 321 F.3d 1331, 1333 (11th Cir. 2003) (citations omitted). Though his brief on appeal does articulate how he was allegedly prejudiced by the IJ's conduct at the hearing, none of those details was before the BIA. We accordingly do not have jurisdiction to decide the unexhausted due process claims.

**B**

As we explained, the record is unclear as to what grounds supported the BIA's decision on past persecution based on an imputed political opinion. In any event, the BIA erred in not considering actual political opinion or mixed motives. The BIA also did not address the question of whether, regardless of past persecution, Mr. Warsame had a well-founded fear of future persecution. We remand that question to the BIA. And we vacate the IJ's and the BIA's findings on the reasonableness of relocation.

26

**1**

We conclude, on this record, that it was error for the BIA to adopt the portion of the IJ's decision discussing imputed political opinion.

"An asylum applicant may prevail on a theory of imputed political opinion if he shows that the persecutor falsely attributed an opinion to him, and then persecuted him because of that mistaken belief about his views." *Najjar*, 257 F.3d at 1289 (quotation marks and citation omitted). But it is unclear whether, in the section of her decision labeled "POLITICAL OPINION," the IJ was deciding actual or imputed political opinion because both terms are used throughout. *See* R. at 240. We are therefore not sure what portions of this section the BIA intended to adopt when it said that "[t]he Immigration Judge also properly found, without clear error, that the respondent was not harmed due to an implied political opinion but rather due to his relationship with his police officer father[.]" *Id.* at 3.

Moreover, we conclude that the IJ's political opinion analysis is flawed. In this section, the IJ denied his claim because "the harm to his father must in some way be tied to him personally, meaning that the harm to his father in the bombing of the police station connects with al-Shaba[a]b not wanting him to teach imputes the harm to his father with the objective to attack or harm him." R. at 241. In her view, Mr. Warsame was "merely string[ing] together a series of suppositions to carry his burden of proof on past persecution[.]" *Id.* The meaning of these statements is, to

us, unclear.

If the IJ decided that Mr. Warsame's claim failed because al-Shabaab's reasons for their multiple attacks and threats against him lacked the requisite identity of motive, then the analysis did not consider the possibility of mixed motives. *See infra* Section III.B.2.    But even viewing the events before Mr. Warsame's graduation, standing alone, we conclude that the IJ's analysis is deficient.  First, the IJ did not consider that the event causing that "harm to the father"—the safehouse bombing—also killed Mr. Warsame's daughter and sister or that Mr. Warsame was present for the attack.  Second, it does not acknowledge that Mr. Warsame's 2014 kidnapping and torture were at least partially related to his father, as he explained. The IJ's taking the events out of context, and her incomplete analysis, make it difficult for us to review the BIA's decision.

We have previously held that the BIA does not properly consider a claim where it did not "coherently explain the extent to which it adopt[s] the decision of the Immigration Judge." *Mezvrishvili v. U.S. Att'y Gen.*, 467 F.3d 1292, 1295–96 (11th Cir. 2006).  Here, not only do we lack a clear underlying decision, but we are also uncertain as to what portion of that decision the BIA adopted.  This failure to "render a reasoned decision in consideration" of Mr. Warsame's claim precludes us from reviewing this claim on appeal.  *Id.* at 1297.  Lacking "the benefit of the BIA's review and resolution of [Mr. Warsame's] central claim," we cannot "meaningfully

28

review" his application, *see Jean-Pierre v. U.S. Att'y Gen.*, 500 F.3d 1315, 1327 (11th Cir. 2007), and we remand for further proceedings.

## 2

Relatedly, we conclude that the BIA erred in not considering the cumulative effects of al-Shabaab's actions, or the role mixed motives might have played in Mr. Warsame's persecution.

Our jurisprudence makes clear that persecution can be cumulative. *See Diallo v. U.S. Att'y Gen.*, 596 F.3d 1329, 1333 (11th Cir. 2010) (collecting cases). Accordingly, even where "each instance of mistreatment, when considered alone, may not amount to persecution, the record may still compel a finding of past persecution when considered as a whole." *De Santamaria v. U.S. Att'y Gen.*, 525 F.3d 999, 1008 (11th Cir. 2008). And "[a] credible death threat by a person who has the immediate ability to act on it constitutes persecution regardless of whether the threat is successfully carried out." *Diallo*, 596 F.3d at 1333–34.

Mr. Warsame—when he was tortured and was the victim of a bombing—has, without question, suffered persecution at the hands of al-Shabaab. Consider *Mejia v. U.S. Att'y Gen.*, 498 F.3d 1253 (11th Cir. 2007), where we found past persecution after the petitioner suffered "threats and attempted attacks over an eighteen-month period, which culminated when he . . . [was] stopped on a roadway by three armed members of the FARC, who threatened [him] at gunpoint, threw him to the ground,

29

and smashed him in the face with the butt of a rifle, breaking his nose." *Id.* at 1257.

Similarly, in *De Santamaria*, we concluded that the petitioner had suffered past persecution where she was repeatedly threatened, yanked by the hair out of her vehicle, threatened in graffiti writing, traumatized by the murder of her groundskeeper for refusing to reveal her location, and eventually beaten, kidnapped, and warned of imminent death. *See* 525 F.3d at 1009. Much like the petitioners in *De Santamaria* and *Mejia*, Mr. Warsame was tortured, suffered the loss of multiple family members (including his daughter, sister, and brother-in-law), and was repeatedly subjected to death threats.

The issue for us is whether Mr. Warsame was persecuted because of a protected ground. The BIA concluded that he was not.

It is "well-established" in our Circuit that mixed-motive claims may qualify for asylum as long as the petitioner "can show that the persecution is, *at least in part*, motivated by a protected ground." *Sanchez Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1232 (11th Cir. 2007) (emphasis in original) (internal quotation marks and citation omitted). We have made clear that a protected ground "need not be the *only* motivation for the persecution." *Id.* (emphasis in original) (collecting cases). *See also* 8§ 1158(b)(1)(B)(i) ("To establish that the applicant is a refugee within the meaning of such section, the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least

30

one central reason for persecuting the applicant.").

Without conducting a mixed-motives analysis, the BIA effectively held that because the 2007 bombing and 2014 torture occurred on the basis of Mr. Warsame's "relationship to his father" and were not related to his status as a teacher (which it nevertheless concluded could not constitute a particular social group), he had not suffered past persecution on the basis of a protected ground. *See* R. at 3. The BIA did not consider that the numerous physical attacks and death threats, though perhaps prompted by different concerns at different times, were ongoing, performed by the same group, and were—in the case of the death threats—very much capable of being carried out.

In many cases, the death threats were directly tied to Mr. Warsame's work as a teacher, as in *De Santamaria*. *See* 525 F.3d at 1010 (holding that substantial evidence did not support the BIA's denial where "the record reflect[ed] that Santamaria's attackers made painfully clear that their motivation for their threats and violence . . . was her support of the Colombian government"). Regardless of whether every past act of persecution was motivated by identical considerations on al-Shabaab's part, the record shows that Mr. Warsame's political opinions provided "at least one central reason" for al-Shabaab's recurrent death threats. 8 U.S.C. § 1158(b)(1)(B)(i). And Mr. Warsame had every reason to believe that al-Shabaab could carry them out, especially given that they killed his best friend (a fellow

31

educator) and his brother-in-law (a family member). *Cf. Sanchez Jimenez*, 492 F.3d at 1233 (holding that the record compelled a finding of past persecution where petitioner had received repeated death threats, almost had his daughter kidnapped, and was shot at multiple times while in a moving car). The BIA's failure to consider a cumulative and mixed-motive claim, despite Mr. Warsame's numerous filings and oral declarations acknowledging that al-Shabaab was after him because of both his father and his teaching activities, was an error. We therefore remand to the BIA to conduct a mixed-motives analysis.

For these same reasons, the BIA also erred in not considering whether Mr. Warsame had a well-founded fear of future persecution. As discussed, a petitioner must "demonstrate a well-founded fear of persecution that is both subjectively genuine and objectively reasonable." *Ruiz*, 440 F.3d at 1257. A petitioner can satisfy the subjective component by providing credible testimony that he "genuinely fears persecution." *Id.* He can satisfy the objective component either by establishing past persecution or, where that is not possible, by showing that "he . . . has a good reason to fear future persecution." *Id.* The BIA's initial determination that Mr. Warsame could not satisfy the nexus requirement with respect to his past persecution may, at the end of the day, ultimately stand on remand. But the abuses Mr. Warsame credibly described at his hearing could constitute a basis upon which he might reasonably fear future persecution on a protected ground.

32

**3**

We conclude that the BIA's relocation determination was not supported by substantial evidence.  As the BIA's decision made explicit reference to, and agreed with, the IJ's analysis, we review that underlying decision.

"[T]he [pertinent] regulation envisions a two-part inquiry: whether relocation would be successful, and whether it would be reasonable." *Arboleda v. U.S. Att'y Gen.*, 434 F.3d 1220, 1223 (11th Cir. 2006) (internal quotation marks and citation omitted).  Adjudicators must consider "whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties." 8 C.F.R. § 1208.13(b)(3).  We have previously held that a failure to consider these factors is reversible error. *See Arboleda*, 434 F.3d at 1226.

The IJ's opinion characterizes our Eleventh Circuit jurisprudence regarding relocation as follows:

> What is required in the Eleventh Circuit is that the government of Somalia is attempting to get control of the country, has gotten control of certain areas of the country, and therefore the respondent could have and should have even attempted to firmly relocate instead of his leaving his wife and daughter behind.

R. at 243.  Apart from the unnecessary moralizing, the IJ's (and therefore the BIA's) determination in this regard was substantively flawed.

33

First, the entirety of the analysis focused on the Somali government's efforts, in conjunction with international assistance, to curb al-Shabaab's territorial gains. That focus, although relevant, is not conclusive. Absent from the analysis was any acknowledgment of Mr. Warsame's clan membership, which he asserted raised threats separate from those presented by al-Shabaab.

For example, in his declaration accompanying his asylum application, he stated that majority clans rule every region of Somalia, and that moving to another region puts a minority clan member in danger. *See* R. at 671–72. Indeed, the clan system is so deeply entrenched that minority clan members risk death if they move to certain areas of the country. *See id.* And, because of his clan membership, Mr. Warsame testified that his life is at risk anywhere he might go within Somalia. *Id.* Moreover, he filed articles supporting these assertions. *See* R. at 96–97, 107, 112– 19, 129–30. The IJ, however, made clear she did not intend to consider them during the following exchange:

> IJ: . . . Sir, I believe you came to the United States because you want to be here. You have admitted to the Court that you knew you could not get a visa. So, you came the way you came. So, you have to return to your country, sir.
>
> Mr. Warsame: Your Honor, the Court hasn't asked me about 20 articles that I have about Somalia that it's not safe.
>
> IJ: Sir, it's not about your articles. Sir, sir, your government is trying, your government does not have to be successful. Somalia may not be the most peaceful

34

> country on the planet, but you don't get asylum because of that.  Your government is trying and with the help of other countries they are succeeding in pushing back against the terrorists.   There are areas in Somalia where you can relocate and you are expected to do so.  Clearly you have admitted that yourself by your father-in-law moving your wife and your daughter.

*Id.* at 409.  This constitutes, at a minimum, a failure by the IJ to consider "whether the applicant would face other serious harm in the place of suggested relocation."  8 C.F.R. § 1208.13(b)(3).

In sum, the IJ does not appear to have considered the relevant § 1208.13(b)(3) factors, which is reversible error.  *See Arboleda*, 434 F.3d at 1226 ("The BIA in this case, however, did not mention any of the other factors it should have considered in making its determination.  This is reversible error.").  Neither the IJ nor the BIA properly considered all of the evidence submitted by Mr. Warsame, and so neither of them "consider[ed] the issues raised and announce[d] [a] decision in terms sufficient to enable [us] . . . to perceive that the Judge has heard and thought and not merely reacted." *Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1374 (11th Cir. 2006).  We therefore conclude that the BIA's finding that Mr. Warsame could safely relocate lacked the requisite reasoned consideration, and remand for further analysis.

## IV

Mr. Warsame did not exhaust his due process claims, and we dismiss his petition as to those claims.  We also conclude that the IJ and the BIA did not

35

adequately consider Mr. Warsame's other claims. We therefore vacate the BIA's order on these claims and remand for further proceedings consistent with this opinion.

**PETITION GRANTED IN PART, DISMISSED IN PART, AND REMANDED.**